Larry FELDMAN, Plaintiff,

v.

U.S. SPRINT COMMUNICATIONS
CO., Defendant.

Civ. A. No. 88–2287 (SSB).

United States District Court,
D. New Jersey.

June 7, 1989.

Kaufman, Frank, Naness, Schneider &
Rosenweig, P.C. by Robert G. Lipp, Mel-
ville, N.Y., for plaintiff.

Hannoch Weisman, P.C. by Mark D.
Schorr, Trenton, N.J., for defendant.

## OPINION

BROTMAN, District Judge.

Plaintiff was a major account representa-
tive for defendant and earned most of his
salary on commission. He has brought this
action seeking compensation for defen-
dant's alleged breach of various compensa-
tion plans. Presently before the court are
defendant's motion for summary judgment
and plaintiff's cross-motion for summary
judgment. For the reasons set forth be-
low, the court will grant in part and deny in
part each of the motions.

## I. FACTS AND PROCEDURE

Larry Feldman ("plaintiff" or "Feld-
man") was an employee of US Telecom,

Inc., in July 1986 when that company merged with GTE Communications Services, Inc., to form US Sprint ("defendant" or "Sprint"), a partnership. Plaintiff had been a major account representative for US Telcom, Inc., since May 1985, and after the merger Sprint retained plaintiff as a major account representative. In that position Feldman sold Sprint's telecommunications products to major telecommunications users and received a commission on those sales as the bulk of his compensation. When plaintiff began working for Sprint in July 1986, his earnings were determined by Sprint's 1986 Sales Compensation Plan ("the 1986 Plan"). Beginning January 1, 1987, his earnings were determined by Sprint's 1987 Sales Compensation Plan ("the 1987 Plan"). In addition, in November 1986 Sprint implemented an Interim Commission Support plan ("ICS") to insure a minimum level of compensation in light of billing difficulties affecting measurement of commissions under the 1986 and 1987 Plans.

Under the 1986 Plan Feldman earned a base salary plus a percentage of his customers' total usage billed on the second invoice after the sale. Feldman's monthly sales quota was $7,000; if he exceeded it, he received thirty-two percent of the revenues billed for the second month of use, and if he did not, he received twenty-eight percent of the revenues billed for the measuring month. The 1986 Plan capped monthly commission earnings at $40,000. In addition, the 1986 Plan provided, "Participants who terminate employment with US SPRINT will receive base salary through their date of termination, and any commissions earned on complete orders submitted through the date of termination." The 1986 Plan also specified that "US SPRINT has the right to change the Plan in any manner whatsoever at any time."

The terms of the 1987 Plan were substantially similar to those of the 1986 Plan. In addition to a base salary, a major account representative earned

> commissions based on the aggregate amount of second invoiced revenue from their sales, at the rate of:

| | |
|---|---|
| Less than $7000 | 28% |
| $7000 and above | 32% |

Those commissions were to be paid as follows:

> Earned commissions will normally be paid with the last payroll check in the month following the second invoiced revenue measurement. The maximum amount of commission that will be paid to any participant in this plan, in any month, is capped at $40,000.

The 1987 Plan further provided that "[t]erminated participants of The Plan (voluntary or involuntary) will be eligible for commissions paid, and commissions earned during their month of termination." The general provisions of the 1987 Plan included the following:

> US Sprint reserves the right to modify, or terminate this plan at any time …
>
> Any modification(s) of this plan, and/or institution of a new commission plan shall be effective on such date as shall be stated in such modification(s), and/or new commission plan, whether or not the affected participant has received prior notification thereof.

In late 1986 Sprint experienced difficulties with its billing system and was unable to generate timely invoices. Because the 1986 Plan was keyed to revenue received by Sprint from a customer's second invoice, Sprint was unable accurately and timely to calculate sales commissions for its employees. To "ensure an even flow of commission earnings while [Sprint] continue[s] to iron out existing back office operational bugs in the Order Entry and Billing systems," Sprint instituted ICS in November 1986. ICS operated simultaneously with the 1986 Plan and later with the 1987 Plan by providing an alternative method for calculating commissions:

> The basis for the Interim Commission Support system is an estimated "Revenue Factor" (Attachment A) that each of your orders should generate, in their second billing month. A total Commissionable Revenue (arrived at by multiplying the number of products sold times the revenue factor) will be used to calculate

minimum earned commissions. This minimum will be compared against actual commissions earned, based on actual revenue billed that month. You will be paid the higher of the Interim system, or the actual. This commission calculation and comparison will be made each month, and you will always receive the larger commission amount.

Under the Sprint commission plans, a major account representative would receive a commission approximately four months after a sale. If the billing system were fully functional and the product could be installed without delay, the representative would make a sale in month 0, Sprint would install the product in month 1, the customer would receive its first invoice in month 2 and its second invoice in month 3, and the commission would be paid in month 4. Under ICS, the representative would receive either the estimated commission or actual commission in month 4. However, the ICS plan also recognized that

> There may be some instances that require adjustments to the commissions paid under the Interim Commission Support system. These will be handled in basically the same method that is used today. You have the responsibility to justify those adjustments, supply the supporting information, and get this signed off through your sales management organization. Then your Division Administrative Manager can send it back to the Sales Comp Group, and get it adjusted in the next paycheck.

The initial explanation of the interim plan did not indicate a cap on possible commissions under ICS different than the cap in place under the other compensation plans. However, in a memorandum dated December 15, 1987, Sprint informed its employees of an ICS cap on commission earnings of $10,000. The memorandum indicated, "These policies have been in effect since the beginning of the ICS system and the current Plan."

Feldman was a highly effective salesman for Sprint; he led the company in his sales figures, and in October 1986 he exceeded his quota by 1831 percent. He learned about the $10,000 ICS cap in mid-January 1987 after he returned from a European vacation. *See* Feldman Deposition at 73. Throughout the winter and spring of 1987 plaintiff became increasingly unhappy with Sprint, and on May 1, 1987, he resigned. Feldman claims that in contemplation of his resignation he met with Sprint's Director of Sales, David Bendeckovic, to discuss payment of commissions after his resignation. Plaintiff claims that Bendeckovic told him he would be paid based on the actual revenue in the second invoice, even if the billings occurred after his resignation. Feldman Affidavit ¶ 19. However, Sprint never paid plaintiff the difference between the estimated commissions and the actual commissions on products that produced a second invoice after plaintiff's resignation.

Plaintiff filed this lawsuit in Suffolk County, New York, Supreme Court in December 1987, the defendant removed the case to the United States District Court for the Eastern District of New York, and that court transferred the case to this court pursuant to 28 U.S.C. § 1404(a). Plaintiff filed an amended complaint in this court in July 1988. In September 1988 the court denied defendant's motion to dismiss counts II, V, and VI of the amended complaint and granted defendant's motion to dismiss count III for failure to state a cognizable claim. Defendant has now moved for summary judgment on counts I (breach of contract), II (unjust enrichment), IV (New Jersey wage and hour law claim), V (fraud), and VI (gross negligence). Plaintiff has cross-moved for partial summary judgment. Neither party now challenges the applicability of New Jersey law.

## II. DISCUSSION

The standard for granting summary judgment is a stringent one, but it is not insurmountable. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In deciding

whether there is a disputed issue of material fact the court must view all doubt in favor of the nonmoving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Recent Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505, and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, even if the movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

### A. *Plaintiff's Contract Claim*

Sprint characterizes this action as primarily one sounding in contract, and it does not deny that the various compensation plans define the relationship between it and Feldman. Sprint contends that "[t]he essential question on this motion is simply whether plaintiff can establish that there is a genuine issue of material fact in connection with his contention that US Sprint did not pay him pursuant to the compensation scheme in force at the time he voluntarily left the company." Defendant's Supporting Brief at 8. Feldman claims that the compensation plans entitle him to additional commission payments after he left Sprint's employ where those payments could not properly be calculated during his month of termination. Sprint claims that the plans entitle Feldman to commission payments earned or paid during the month of his termination and not to commissions earned or paid thereafter.

The focus of this dispute involves those sales on which Sprint paid Feldman a commission under ICS but—because Sprint sent the second invoice after his termination—never compared the ICS commission with that under the 1986 or 1987 Plan. Because Sprint capped the monthly commission earnable under ICS at $10,000 while the cap under the 1986 and 1987 Plans was $40,000, Feldman faced a substantial commission shortfall if his earnings were to be measured only by ICS. Sprint argues that the comparison between ICS and 1986 or 1987 Plan commissions was to be made on a monthly basis and not on a product-by-product basis. Under Sprint's reading of the compensation plans, commissions were to be paid in the fourth month after a sale based on either the ICS estimated commission or the actual second invoice to the customer. In addition, Sprint relies on language in the compensation plans allowing it to modify the compensation scheme at any time without notifying its employees. It claims that modification of the plans by adding the ICS and capping ICS commissions curtailed Feldman's rights under the 1986 and 1987 Plans.

The court finds Sprint's arguments unpersuasive. At best, the compensation plans are ambiguous as to the interaction between ICS and the 1986 and 1987 Plans. Sprint argues that ICS was an income maintenance plan and therefore had a substantially lower cap on earnings than the 1986 and 1987 Plans, and then it argues that where the second-month invoice could not be sent until after the ICS commission was paid there would be no comparison between the estimated and actual commis-

sions. The court finds those assertions inconsistent. If ICS was indeed designed to carry over Sprint employees until a second-month invoice could be generated, then there ultimately had to be some comparison between estimated and actual commissions. Indeed, the ICS plan itself contemplated that "[t]here may be some instances that require adjustments to the commissions paid under the Interim Commission Support system." Although Sprint may have intended to compare actual and estimated revenue on a monthly basis rather than on a product-by-product basis, it did not clearly so indicate in the language of the compensation plans.

Although the compensation plans do contemplate certain adjustments in commissions paid under ICS to reflect the actual commission earned, they do not require that such an adjustment be made in every instance. The attachments distributed with the description of the ICS plan indicate that in general commission payments were to be made in the fourth month after a sale based either on actual commission or on an alternative estimated commission. Only in certain unspecified instances would a postpayment adjustment be necessary. Although the various plans do not set forth when such an adjustment would be appropriate, the court finds that Sprint must make such a comparison where it is necessary to avoid a substantial deviation from an employee's expected earnings under the 1986 and 1987 Plans.

■ There is an implied covenant of good faith in every contract pursuant to which neither party shall do anything that will destroy or injure the right of the other party to receive the fruits of the contract. *Onderdonk v. Presbyterian Homes*, 85 N.J. 171, 182, 425 A.2d 1057 (1981); *Association Group Life, Inc. v. Catholic War Veterans of the United States*, 61 N.J. 150, 153, 293 A.2d 382 (1972) (per curiam); *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130, 207 A.2d 522 (1965); *Kislak Co. v. Geldzahler*, 210 N.J.Super. 255, 263, 509 A.2d 320 (Law Div.1985). *See generally* E. Farnsworth, *Contracts* § 7.17, at 526–28 (1982). This duty of good faith proscribes

certain undesirable conduct and in some instances requires affirmative action. *See id.* at 527. Reading into the compensation plans a duty of good faith and fair dealing, the court finds that Sprint is obliged not to interfere with the mechanism through which its employees earn their commission. It could not, for example, intentionally delay installation or billing to avoid paying commission. Similarly, where Sprint unintentionally cannot produce timely invoices and therefore creates an income maintenance plan to assist its employees, it cannot use that plan to deny the employees the commissions they have actually earned and should have been paid but for its failure to send invoices.

By its own description, Sprint's ICS plan is a supplement to rather than a modification of the otherwise existing compensation plans. Consequently, nothing in the ICS can work to undermine any expectancy an employee has under either the 1986 or 1987 Plan. If the court were to read the combined compensation plans to allow Sprint to benefit by delaying billing and therefore limiting employees to $10,000 estimated commission for a given month rather than $40,000 actual commission, it would allow Sprint to benefit unjustly by its inability to generate timely invoices. Sprint insists that the compensation plans must be read together, and reading them together indicates that Sprint must make future adjustments based on actual billings where not to do so would violate its implied covenant of good faith.

The court reads the compensation plans to require Sprint to compare sales on a product-by-product basis. Consequently, the plaintiff earned the disputed commissions before he resigned and he is entitled to the difference between the estimated ICS payments already made and the amounts he actually earned based on the 1986 and 1987 Plans. The court will therefore deny defendant's motion for summary judgment on count I and will grant plaintiff's cross-motion on that count on the question of liability. However, there remains a material factual question as to the amount due to Feldman: he must establish the amount to which he is entitled based

upon second invoices generated after he left Sprint for products he sold prior to his departure.

## B. *Plaintiff's Other Claims*

### (1) *Wage and Hour Law Claim*

Plaintiff claims he is entitled summary judgment on his claim under New Jersey's wage and hour law, N.J.Stat.Ann. § 34:11–4.3, because there is no factual issue in dispute and because the statute requires Sprint to pay him the disputed commissions. The statute provides in part,

> [W]henever an employee quits, resigns, or leaves employment for any reason, the employer shall pay the employee all wages due not later than the regular payday for the pay period during which the employee's termination, suspension or cessation of employment (whether temporary or permanent) took place, as established in accordance with section 2 of this act; or, in the case of employees compensated in part or in full by an incentive system, a reasonable approximation of all wages due, until the exact amounts due can be computed....

N.J.Stat.Ann. § 34:11–4.3 (1988) (footnote omitted). Sprint's response to Feldman's wage and hour law claim is that it is a statutory version of his breach of contract count. The court agrees. To the extent that Sprint has breached its obligations under the various compensation plans it has also violated its statutory duty under the wage and hour law. For the same reasons the court denied defendant's motion for summary judgment and granted plaintiff's cross-motion for summary judgment on the contract claim, it must deny defendant's summary judgment motion and grant plaintiff's cross-motion for summary judgment on this claim. As with the contract claim, there remains a material question of fact as to damages.

### (2) *Unjust Enrichment*

■ Count II of plaintiff's complaint alleges unjust enrichment. However, such a remedy is unavailable in this case because there is an express agreement setting forth the measure of the plaintiff's compensation and the plaintiff has not breached his obligations under the agreement. *See Callano v. Oakwood Park Homes*, 91 N.J.Super. 105, 108–09, 219 A.2d 332 (App.Div.1966); *see also* E. Farnsworth, *supra*, § 12.20, at 913 ("Restitution will be denied if the injured party has fully performed, and all that remains is for the party in breach to pay a definite sum in money as the price of that performance.") The court will therefore grant defendant's motion for summary judgment on count II.

### (3) *Fraud*

■ Count V of plaintiff's complaint alleges fraud. Sprint seeks dismissal of plaintiff's fraud claim on two grounds: (1) the allegedly fraudulent statements were made in the fulfillment of the contract rather than the inducement, and therefore are not actionable; and (2) plaintiff has failed to allege detrimental reliance. In support of the first ground Sprint cites *Anderson v. Modica*, 4 N.J. 383, 73 A.2d 49 (1950), wherein the Supreme Court of New Jersey held that to be actionable "fraud must be in the original contract or transaction and not in the nonfulfillment of the contract." *Id.* at 392, 73 A.2d 49. But unlike *Modica*, the contract at issue in this case is a continuing one, which Sprint could modify at any time. In essence, each time a Sprint employee sells a product he or she enters into the equivalent of a new agreement with Sprint, the terms of which are defined by the then-existing compensation plan. Consequently, Sprint could have fraudulently induced the plaintiff to sell more products and therefore enter into the equivalent of successive new agreements with Sprint. In addition, the second ground for Sprint's objection to plaintiff's fraud count is without basis. It is clear from plaintiff's complaint that he continued to sell Sprint products in reliance on representations about the compensation he would receive. The court, therefore, will deny defendant's motion for summary judgment on count V.

### (4) *Gross Negligence*

■ Plaintiff boldly asserts in count VI of his complaint that Sprint committed

gross negligence because, *inter alia,* it failed properly to oversee the order entry system, it delayed installation of products, it failed to purchase sufficient access to telephone lines to handle plaintiff's sales, it failed to supervise installation crews, and it failed to generate customer invoices until after plaintiff resigned. However, plaintiff fails to cite a single case supporting a theory of recovery sounding in negligence. The court holds that there can be no recovery for the alleged negligence because there is no duty owed to plaintiff other than that arising out of the contract that the defendant allegedly breached. *See Coyle v. Englander's,* 199 N.J.Super. 212, 226, 488 A.2d 1083 (App.Div.1985). The court must therefore grant defendant's motion for summary judgment on count VI.

## III. CONCLUSION

The essence of this dispute requires the court to interpret the various Sprint compensation plans in effect while Sprint employed the plaintiff as a major account representative. The court reads those plans to require the defendant to pay the plaintiff the actual commission he earned on products sold based on actual second invoices, regardless of whether those invoices were generated prior or subsequent to plaintiff's departure from the company. The court cannot, however, summarily resolve the question of damages because factual issues remain in dispute about the amount of money owed to Feldman. In addition, the court will apply its ruling on plaintiff's contract claim to his New Jersey wage and hour law claim; the court will deny defendant's motion for summary judgment on plaintiff's fraud claim; and the court will dismiss plaintiff's unjust enrichment and gross negligence claims.

An appropriate order will be entered.

This matter having come before the court on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment; and

The court having considered the submissions of the parties; and

For the reasons set forth in the court's opinion filed this date;

IT IS on this 7th day of June, 1989, hereby

ORDERED that defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART and that counts II and VI of plaintiff's amended complaint are DISMISSED; and it is

FURTHER ORDERED that plaintiff's cross-motion for summary judgment is GRANTED as to liability on counts I and IV.

No costs.