243 N.J. Super. 420 (1990)
579 A.2d 1252
CHARLES W. NOLAN, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
CONTROL DATA CORPORATION, A FOREIGN CORPORATION, DEFENDANT-RESPONDENT, CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 4, 1990.
Decided August 22, 1990.
*421 Before Judges KING, SHEBELL and KEEFE.
Robert J. Hrebek argued the cause for appellant-cross-respondent (Robert J. Hrebek, on the brief).
Stephen M. Offen argued the cause for respondent-cross-appellant (Schachter, Cohn, Trombadore & Offen, attorneys; Stephen M. Offen and Christopher W. Jones of the New York Bar, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This case concerns the interpretation of the compensation terms of an employment contract for a salesman of defendant Control Data Corporation (CDC), a computer company. The written contract gave the employer the absolute and unfettered power to alter sales quotas and thereby compensation rates retroactively, currently or prospectively without notice and presumably without reason. We hold that this absolute and unfettered power in the contract must be exercised in good *422 faith and for legitimate business reasons so as not to deprive an employee of the fairly agreed benefits of his labors.
Plaintiff appeals from an adverse verdict after a nonjury trial in his suit for damages under the compensation agreement. Plaintiff was a computer salesman for defendant from 1982 to 1985. He claims that (1) the compensation agreement was subject to an implied obligation of good faith and fair dealing on the part of his employer, (2) he was "short-changed" or defrauded under the express terms of his 1985 compensation agreement, and (3) his acceptance of a "final settlement" offered by CDC in 1985 was not an accord and satisfaction. Defendant CDC cross-appeals from the dismissal of its counterclaim which sought return of certain allegedly unearned advances to plaintiff. This published portion of our opinion relates to the claims for 1983 and 1984 only which involve the employer's right to alter sales quotas retroactively.
In May 1986 plaintiff sued CDC for money damages for alleged breach of contract and tortious conduct. Nolan claimed that CDC failed to properly compensate him for services performed as a salesman between 1983 and 1985. After the four-day nonjury trial, the judge dismissed both the complaint and the counterclaim. Nolan moved for a new trial and for amendment of the judgment. The judge denied the motion for new trial but amended the judgment to provide for his recovery of $2,793.73. As noted, both parties appeal.
This claim involves Nolan's right to compensation under a series of employment contracts in effect from 1983 to 1985. Nolan began his career with defendant CDC in February 1982. During 1982, Nolan was first employed as a part-time sales trainee and, eventually, became a full-time "Associate Marketing Representative" in CDC's Division of "Business Information Services" (BIS). This Division of CDC marketed computer timesharing services. BIS had offices in most major American cities. During 1982, Nolan was compensated by salary paid on an hourly basis.
*423 In January 1983 Nolan continued in his position as an "Associate Marketing Representative." At that time, however, Nolan was removed from a "salary only" position and placed on a quota-based compensation plan. Nolan testified that he understood "fundamentally" how he would be compensated under this new plan. He explained:
Prior to January 1, 1983 a discussion with a marketing manager that had been assigned to me in which discussion it was or became known to me that sometime in early 1983 I would be presented with a sales plan developed by B.I.S. and that I would be expected to sign off on this plan and that I would be compensated according to provisions of the plan.
Early in 1983 Nolan attended a meeting during which the "key provisions" of the sales plan were discussed. Shortly after that meeting, Nolan's "Marketing Manager" presented him with a copy of the sales plan. He asked Nolan to review and sign it. He did.
The 1983 sales plan described the duties of a marketing representative and provided for three elements of compensation: salary, incentive compensation and bonus. The compensation scheme described in the plan was extraordinarily complex. Significant to the present action are three clauses contained in the plan which provide:
A. 4. Quota
A yearly quota, subject to change by Control Data, shall be established for each Territory;
C. 10. Revisions
At any time and without notice, revisions may be made to the Plan both prospectively and retroactively;
D. 8.b. Rights Reserved to Control Data
Control Data reserves the right without notice to:
* * * * * * * *
make any retroactive, current and/or prospective adjustments or revisions to salaries, bonuses, incentive compensation levels, quotas, Territories, or any other matters affecting an Employee's employment.
Accompanying the sales plan was a letter which read:
I hereby acknowledge receipt and acceptance of the Amendment to the Control Data Business Information Services 1983 Sales Representatives' Compensation Plan (the "Plan").

*424 I acknowledge that I have read and understand the Plan, including all of its administrative provisions. Furthermore, in consideration of my employment during 1983 by Control Data Corporation, I agree to comply with all provisions of the Plan and I specifically acknowledge my understanding and agreement with the provisions of Section D, Item 3 [Termination], of this Plan.
I understand that Control Data Corporation reserves the right to cancel, change or modify, both retroactively and/or prospectively, any and all portions of the Plan or any amendments thereto, at any time without notice.
Nolan testified that he understood and signed this acknowledgement.
According to CDC, the "unique mission" of Nolan's particular "marketing group," called the "AT & T" group, made appropriate yearly compensation inherently difficult to calculate in advance. The AT & T group's primary responsibility was marketing CDC's services to AT & T. William Friend, BIS' manager of National Accounts and Sales Support Services, explained that while other BIS sales groups concentrated on selling CDC's proprietary computer languages, the AT & T group sold problem-solving computer packages written in the "BASIC" computer language which CDC did not own. After CDC developed the appropriate problem-solving computer applications, AT & T would "bring it in-house." Thus, the AT & T group generated revenue notably characterized by peaks and valleys. According to Friend, the "spiky revenue" produced by the AT & T group, along with other distinctive characteristics of the group ____ such as the existence of a "very large support organization" ____ was the reason it was so difficult to fairly compensate those within that group. Friend said that the reason for manipulating sales quotas was to fairly compensate employees and that quotas were decreased far more frequently than they were increased. The quota in effect at the calendar year's end determined the compensation that an employee ultimately received.
By memorandum dated July 11, 1983 Nolan's quota under the 1983 sales plan was initially set at $1,000,000. This memorandum cautioned that "[g]iven the size and complexity of [Nolan's] territory ... exceptions and changes are possible. Therefore, *425 we will discuss each situation as it occurs." By memorandum of August 23, 1983 Nolan was advised that his 1983 sales quota had been increased to $1,075,000. Nolan acknowledges that he received this memorandum and, in addition, discussed the increase in his quota with his Marketing Manager. In October 1983 Nolan's sales quota was reduced to $1,050,000. Nolan testified that this reduction was in appreciation of his good work. In November 1983 Nolan was promoted to "Marketing Representative" and received a salary increase. Nolan claims that he exceeded the $1,050,000 quota finally established for 1983 and was paid a total of $41,439. Nolan alleges that his 1983 compensation was deficient by $5,298.45. He states that he has no dispute over the salary component of the 1983 sales plan ($18,964) which he received and accepted. Rather, Nolan urges that he was improperly denied "incentive compensation" and "bonus." Nolan's claim is premised upon his view that CDC could not manipulate his sales quota other than in "good faith" and that the 1983 quota increase was not made in "good faith."
In 1984 Nolan continued to work for CDC's AT & T sales group. Nolan's compensation was governed by CDC's 1984 sales representatives' compensation plan. Again, the plan provided for three elements of compensation comprised of salary, incentive compensation and bonus. There is no dispute over the salary component of the plan. The 1984 sales plan, like its predecessor, contained a provision which provided:
I understand that Control Data Corporation reserves the right to cancel, change or modify, both retroactively and/or prospectively, any and all portions of the Plan or any amendments thereto, at any time without notice.
Nolan testified that he understood and signed this provision. The 1984 sales plan, also like its predecessor, provided that "[a] yearly quota, subject to change by Control Data, shall be established for each territory" and reserved to CDC the right to "make any retroactive, current and/prospective adjustments or revisions to salaries, bonuses, incentive compensation levels, [and] quotas...." At trial, Nolan conceded that he was familiar *426 with these rights reserved to CDC and that he "understood [them] to mean that [CDC] could change [his] quota." By memorandum dated February 15, 1984, Nolan's 1984 quota was set at $500,000. However, this memorandum again warned:
There are many factors which make the assignment of Quota a difficult task. Such factors include: Territory size, complexity, uncertainty; plus the extraordinary resources available to you. Therefore, as we discussed, it will be necessary to review these numbers on an as needed basis in order to establish and maintain their validity.
This warning proved accurate. Nolan's quota was changed on five separate occasions during 1984 and was ultimately increased to $710,000. Nolan exceeded this quota and was paid a total of $65,679 for his services in 1984. In addition, presumably to show appreciation for his fine efforts, CDC treated Nolan and his wife to a week's luxury cruise of the Aegean Islands. Again, Nolan's complaint is that CDC had no right to increase his quota beyond the original $500,000 level. As a result, he claims that he was improperly compensated. Nolan also alleges that during 1984 he was improperly denied a "Strategic Revenue Bonus" (SRB). CDC claims that the SRB replaced an earlier bonus plan referred to as the "New Account Install Revenue Bonus" (NAIRB) to which Nolan was concededly not entitled. The SRB incorporated the NAIRB and was dependent upon the NAIRB for its calculation. CDC asserts that a different bonus plan, referred to as the "Total Revenue Growth" (TRG) bonus, applied to Nolan and that he was paid this bonus. There is no dispute that Nolan was paid the TRG bonus. Nolan contends that he was entitled to both the SRB bonus and the TRG bonus. At trial, Nolan conceded that he first realized that he was "entitled" to the SRB as discovery in this case unfolded.
Nolan also claims to have been entitled to a "special achievement bonus" (SAB) which was provided in the 1984 plan. While Nolan was paid this bonus in the amount of $18,950.70, this amount was calculated on the basis of the final 1984 $710,000 sales quota. Nolan urges that the original $500,000 quota was the appropriate basis for calculating the SAB. Under this view, *427 Nolan alleges that the SAB should have been $41,000.65 and that he was thus underpaid $22,049.95 on account of the SAB. Nolan further asserts that he was underpaid by $3,310.25 under the incentive compensation component of the 1984 sales plan. Again, this conclusion is premised on the assumption that CDC had no right to increase Nolan's sales quota above $500,000. In summary, under the bonus component of the 1984 sales plan, Nolan claims to have been entitled to:

 SAB $41,000.65
 TRG 4,666.84
 SRB 25,000.00
 ___ __________
 TOTAL $70,667.49

Nolan was paid the TRG bonus of $4,666.84. Nolan was paid his SAB bonus to the extent of $18,950.70. Nolan was not paid an SRB at all. Thus, Nolan contends that he was entitled to a total 1984 bonus of $70,667.49 but that he only received a bonus of $23,617.54 on account of both the TRG and SAB bonuses plus $1,440.89 in miscellaneous bonuses for a grand total of $25,058.43. The resulting deficiency for 1984, Nolan contends, was thus $45,609.06. When this figure is combined with the purported $3,310.25 incentive compensation underpayment, the total alleged 1984 compensation deficiency was $48,919.31. In sum, the issues in dispute for 1984 are whether: (1) Nolan's incentive compensation should be calculated on the basis of his original $500,000 sales quota or on his final, adjusted sales quota of $710,000; (2) Nolan was entitled to the SRB bonus at all; and (3) the SAB was to be computed, as Nolan urges, on the basis of his original $500,000 sales quota or, as CDC urges, on the basis of the final $710,000 sales quota. [Since the published opinion is limited to the claims for 1983 and 1984, the facts relating to the claims for 1985 are redacted.] In September 1985 Nolan resigned from CDC's employ.
Nolan's total claim was for $5,298.45 (1983) and $48,918.74 (1984). CDC had demanded a net of $4,556.21 on its counterclaim. Following the bench trial, the judge filed a written opinion. She essentially found that although CDC's "practices *428 and policies set forth by the testimony in this case [were] most unreasonable, Nolan's only recourse with respect to such problems was to resign." She stated:
Plaintiff, according to his own testimony, was fully aware that CDC could modify the terms of employment. He was on notice at all times of the transient nature of the employment contract terms. He read the Plans. He acknowledged their receipt and his review of them. He was warned by supervisors to expect charges. He experienced many changes. He does not assert that CDC failed, in making changes, to follow its own policy.
In Woolley v. Hoffman [Hoffmann] La Roche, Inc., 99 N.J. 284 [491 A.2d 1257] (1985), the court concluded that employees' legitimate expectations derived from the employer's own publications must be enforced. Clearly the CDC Plan set forth CDC's policies as to employees' production and compensation. Plaintiff, knowing of the policies, must have expected to be bound by them.
The judge concluded that "[t]he law governing [Nolan's] employment contract allows [him] no protection against the employer's unilateral modifications in compensation." The judge also found that Nolan's acceptance of CDC's 1985 "final settlement" statement constituted an accord and satisfaction with respect to his 1985 compensation and amounted to a "waiver" as to Nolan's claim under the 1984 sales plan.
With respect to CDC's counterclaim for $7,350 based on its 1985 advance against prospective sales commissions to Nolan, the judge found that the advance "check was not transmitted with any communication regarding conditions, limitations or identification of fund source.... [Nolan] testified that he first learned of the purported basis for the advance when he received the settlement analysis at the end of July 1985. [The judge found] that Nolan's testimony about the advance was credible and conclude[d] that he did not receive effective contemporaneous notice that the payment was conditioned, in part, on a sale that had not yet been (or ever was) finalized." Because the judge believed that conditions could not be retroactively imposed on a payment that was nonconditional when made, CDC's counterclaim failed.
In a supplemental opinion rendered on December 8, 1988 the judge found CDC liable to Nolan for $2,793.73 on account of his commissions earned in August and September, 1985 as well as *429 his earned vacation pay. Apparently, CDC had retained these monies as a set-off against the 1985 advance to Nolan which CDC sought to recover. In view of the judge's conclusion on the counterclaim, she said that the advance, "could not be viewed as conditional, [and] the withholding of payment in connection with recovery of such payment [could not] be sanctioned." The rulings on this supplemental opinion are not directly implicated on this appeal.

I
Nolan and CDC consume considerable energy arguing over whether Nolan was an employee "at will." Apparently, the cause for this dispute is CDC's assumption that in New Jersey no implied obligation of good faith and fair dealing can arise in an "at will" employment relationship. This view is unsupported by our cases. While true that in New Jersey an employer can discharge an "at will" employee at any time and for any reason,[1] this principle is a consequence of the fact that the length of an "at will" employee's engagement is not controlled by contract. In the absence of a contract, there is no implied covenant of good faith and fair dealing. Noye v. Hoffmann-La Roche Inc., 238 N.J. Super. 430, 433, 570 A.2d 12 (App.Div. 1990). This does not mean that an implied obligation of good faith is inapplicable to those aspects of the employer-employee relationship which are governed by some contractual terms, regardless whether that relationship is characterized generally as being "at will." As to such aspects, there can be no doubt that they are subject to the implied covenants of good faith and fair dealing extant in all contracts. Id. at 432, 570 *430 A.2d 12; Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182-183, 425 A.2d 1057 (1981); Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123, 129-130, 351 A.2d 349 (1976); Feldman v. U.S. Sprint Communications Co., 714 F. Supp. 727, 731 (D.N.J. 1989); see Farnsworth, Contracts § 7:17 at 526-634 (1982).
We must first address whether the aspects of the employment relationship in issue here were governed by contract, express or implied. The amount of compensation to which Nolan was entitled while in CDC's employ is the sole issue. We conclude that during 1983 and 1984, this aspect of the parties' employment relationship was governed by CDC's "Sales Representatives' Compensation Plan[s]" and their amendments. These "sales plans" were compensation contracts. The sales plans were offers which Nolan accepted both by his express assent to the terms they contained as well as by his continued performance when he had no obligation to continue. Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 302, 491 A.2d 1257 (1985). Nolan's performance constituted sufficient consideration to entitle him to any benefits that the plans described. Id. at 302, 491 A.2d 1257.
The precise issue here is whether CDC's retroactive manipulation of Nolan's 1983 and 1984 sales quotas was justified or whether it constituted a breach of contract. The resolution of this issue turns upon the interpretation which we give to the pertinent provisions of CDC's sales plans. As noted, each sales plan contained the following provisions:
A. 4. Quota
A yearly quota, subject to change by Control Data, shall be established for each Territory;
C. 10. Revisions
At any time and without notice, revisions may be made to the Plan both prospectively and retroactively;
D. 8.b. Rights Reserved to Control Data
Control Data reserves the right without notice to:
* * * * * * * *

*431 make any retroactive, current and/or prospective adjustments or revisions to salaries, bonuses, incentive compensation levels, quotas, Territories, or any other matters affecting an Employee's employment.
Read literally, these provisions supplied CDC with the unilateral right to manipulate Nolan's compensation scheme without limitation. Literal interpretation of these clauses would go far towards making these contracts illusory, a result which courts usually seek to avoid. Russell v. Princeton Laboratories, Inc., 50 N.J. 30, 38, 231 A.2d 800 (1967). In Russell, Chief Justice Weintraub, for our Supreme Court, said that "[a] contract should not be read to vest a party ... with the power virtually to make his promise illusory." Id. For example, in Feldman, 714 F. Supp. at 731, the Federal District Court, Judge Brotman, held that a sales compensation plan, similar in many ways to the plan in issue here, contained an implied covenant of good faith and that neither party would be allowed to injure or destroy the right of the other party to receive the fruits of the contract. In Feldman, the defendant U.S. Sprint experienced difficulties with its customer billing system and thus became unable to accurately and timely calculate employee sales commissions that were provided under the defendant's sales compensation plan. Id. at 728. To alleviate this problem, the defendant instituted an "Interim Commission Support System" which provided plaintiff with sales commissions in a more timely fashion. Plaintiff sued claiming that his commissions under the "Interim" plan were less than he was entitled to receive under the original sales compensation plan. The defendant urged that plaintiff's claim was baseless because, among other things, its original sales plan gave it the absolute, unqualified right to "modify or terminate" its compensation scheme at any time. The court found it unnecessary to consider the defendant's unappealing argument because it concluded that the ICS Plan was "a supplement to rather than a modification of the otherwise existing compensation plans. Consequently, nothing in the ICS [could] work to undermine any expectancy an employee" had under the original sales plans. Id. at 731. *432 Significantly, the court noted that the defendant would not be permitted to depart from the scheme of its original sales compensation plan where to do so would violate its implied covenant of good faith. Id.
These basic precepts of contract interpretation militate against our finding that CDC's sales plans conferred upon it the absolute, unfettered discretion to amend its compensation scheme retroactively at any time and for any reason whatever. Rather, a more reasonable and constrained construction of the contract is indicated. While CDC suggests that the language of its sales plans bestows upon it virtually limitless powers, we must seek to determine whether such an interpretation ever was within the fair contemplation of the parties. "The polestar of construction of a contract is to discover the intention of the parties." Kearny PBA Local # 21 v. Town of Kearny, 81 N.J. 208, 221, 405 A.2d 393 (1979).
A particularly persuasive case on the proper interpretation of CDC's obligations under its sales compensations plans is Tymshare, Inc. v. Covell, 727 F.2d 1145 (D.C. Cir.1984) (Virginia law). In that opinion, written by then-Judge Scalia, the District of Columbia Circuit Court of Appeals was faced with plaintiff Covell's claim that defendant Tymshare failed to exercise its unlimited discretion under its "compensation plan" applicable to Covell, a salesman, in good faith. Covell alleged, as does Nolan in the present case, that his employer improperly manipulated his sales quotas to deprive him "of the fairly agreed benefit of his labors." Id. at 1154. The "compensation plan" in Covell provided the employer, Tymshare, with the power to modify or terminate the plan in its "sole discretion." Id. at 1148. With respect to sales quotas, the Tymshare plan specifically stated:
Below are some examples of provisions under which adjustment to the quota plan may be made. This list is not exhaustive and management reserves the right to change the quota plan and individual quota and reserve payments at any time during the quota year within their sole discretion. [Id. at 1148.]
Judge Scalia began his analysis with a review of the doctrine that a person performing under a contract must do so in good *433 faith. This doctrine, he said, "is simply a rechristening of fundamental principles of contract law." Id. at 1152. Judge Scalia noted his agreement
with the observation of Professor Summers that the concept of good faith in the performance of contracts
is an "excluder." It is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out.
Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 VA.L.REV. 195, 201 (1968) (footnotes omitted). Also correct, it seems to us, is the perception of Professor Farnsworth that the significance of the doctrine is "in implying terms in the agreement." Farnsworth, Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code, 30 U.CHI.L.REV. 666, 670 (1963). When these two insights are combined, it becomes clear that the doctrine of good faith performance is a means of finding within a contract an implied obligation not to engage in the particular form of conduct which, in the case at hand, constitutes "bad faith." In other words, the authorities that invoke, with increasing frequency, an all-purpose doctrine of "good faith" are usually if not invariably performing the same function executed (with more elegance and precision) by Judge Cardozo in Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 91, 118 N.E. 214, 214 (1917), when he found that an agreement which did not recite a particular duty was nonetheless "`instinct with [. ..] an obligation,' imperfectly expressed," quoting from McCall Co. v. Wright, 133 A.D. 62, 68, 117 N.Y.S. 775, 779 (1909), aff'd, 198 N.Y. 143, 91 N.E. 516 (1910). The new formulation may have more appeal to modern taste since it purports to rely directly upon considerations of morality and public policy, rather than achieving those objectives obliquely, by honoring the reasonable expectations created by the autonomous expressions of the contracting parties. But it seems to us that the result is, or should be, the same. [Covell, 727 F.2d at 1152-1153; footnotes omitted.]
Whether analyzed under the rubric of "good faith" or "implied limitation," Judge Scalia explained that
the object of [the court's] inquiry is whether it was reasonably understood by the parties to this contract that there were at least certain purposes for which the expressly conferred power to adjust quotas could not be employed. If not, then [Tymshare] is correct that no action in this regard could constitute "bad faith" ____ or, as we would put it, there is no implicit contractual restriction. [Id. at 1153.]
Although the court accepted Tymshare's contention that some contracts may legitimately leave certain decisions "absolutely to the uncontrolled discretion of one of the parties," the "trick *434 [said Judge Scalia] is to tell when a contract has been so drawn ____ and surely the mere recitation of an express power is not always the test." Id. at 1153. He also noted Tymshare's reliance on the "expansive fashion" in which it reserved the power to alter sales quotas. "The Compensation Plan states and reiterates that Tymshare may change the quota plan `within in [its] sole discretion,'.... But as the administrative law concept of `abuse of discretion' suggests, see 5 U.S.C. § 706(2)(A) (1982), this phrase is not necessarily the equivalent of `for any reason whatsoever, no matter how arbitrary or unreasonable.'" Id. at 1154. Judge Scalia concluded:
... the reasonably understood effect of an expansive modifier varies from case to case depending upon the nature of the power at issue. Where what is at issue is the retroactive reduction or elimination of a central compensatory element of the contract ____ a large part of the quid pro quo that induced one party's assent ____ it is simply not likely that the parties had in mind a power quite as absolute as Tymshare suggests. In the present case, agreeing to such a provision would require a degree of folly on the part of these sales representatives we are not inclined to posit where another plausible interpretation of the language is available. It seems to us that the "sole discretion" intended was discretion to determine the existence or nonexistence of the various factors that would reasonably justify alteration of the sales quota. Those factors would include (as the company's practice under the provisions bears out) an unanticipated volume of business from a particular customer unconnected with the extra sales efforts of the employee assigned to that account; and they may perhaps include other eventualities, such as a poor overall sales year for the company, leaving less gross income to be expended on commissions. The company's genuine determination that one or another of these factors exists can presumably not be questioned. But the language need not (and therefore can not reasonably) be read to confer discretion to reduce the quota for any reason whatever ____ including what Covell has alleged here, a simple desire to deprive an employee of the fairly agreed benefit of his labors. [Id. at 1154.]
We conclude that Tymshare provides an appropriate model for informing the contents of the good faith contractual-performance doctrine with regard to compensation contracts such as the one in the case before us. The Tymshare analysis complements the general good faith rule expressed by our Supreme Court in Onderdonk, 85 N.J. at 171, 425 A.2d 1057, and Bak-A-Lum Corp., 69 N.J. at 129-130, 351 A.2d 349. See Note, "Implied Duty of Good Faith," 81 Nw.U.L.Rev. 539, *435 553-554 (1987); Faruki, "Defending Terminated Dealer Litigation," 46 Ohio St.L.J. 925, 976-977 (1985).
Another D.C. Circuit case, Gray v. American Exp. Co., 743 F.2d 10 (D.C. Cir.1984), also applied this principle in a different commercial context, credit card cancellations without notice and without cause. American Express contended that the "without notice" provision should be interpreted "so as to give the creditor's internal cancellation decision effect as against irreversible transactions that already have been completed." Id. at 17. Applying New York law in an opinion by Judge Mikva, the court rejected American Express' contention of an unbridled power to cancel by internalized decision without notice to the cardholder. The expressions of Judge Mikva, with which we agree, are pertinent to our concern here. He said:
There can be no dispute that American Express drew the language for a broad application. But if American Express were correct in its interpretation, it even could refuse to honor past charges long since incurred ____ an outcome that must be rejected even in application of strictum jus. The right to cancel "without giving you notice" means that the decision to cancel can be entirely unilateral and instantaneous. It cannot, however, be an internalized decision which is never communicated to the cardholder. Such a reading defies any reasonable expectation that the parties could have had about their contractual relationship. See Uni-Serv [Corporation v. Frede] supra, [50 Misc.2d 823] 271 N.Y.S.2d [478] at 483 [1966] ("It is not to be assumed that people act unreasonably to their own disadvantage, and an interpretation which assumes that they so acted is not favored.") (quoting Brown v. McGraw-Hill Book Co., Inc, 25 A.D.2d 317, 269 N.Y.S.2d 35, 38 (1st Dept. 1966), aff'd, 20 N.Y.2d 826, 285 N.Y.S.2d 72, 231 N.E.2d 768 (1967)); see also 1 Williston on Contracts § 105 at 418 (3d ed. 1957) (interpret contract so as not to favor arbitrary cancellation clause); cf. Tymshare, Inc. v. Covell, 727 F.2d 1145, 1154 (D.C. Cir. 1984) (applying Virginia law; "[I]t is simply not likely that the parties had in mind a power quite as absolute as appellant suggests ... [A]greeing to such a provision [retroactive compensation reduction] would require a degree of folly ... we are not inclined to posit where another plausible interpretation of the language is available."). Thus, we think that the "without notice" provision is given full weight by allowing the cancellation to be unilateral and to be given contemporaneous effect upon communication. To say that "without notice" also means that it never need be communicated to the cardholder extends the clause, and the waiver it contains, "to circumstances not covered." 2 M. Merrill, supra § 899 at p. 427 (waiver of notice construed narrowly).

*436 Indeed, the interpretation of the language urged by American Express would subsume the entire contract and make the underlying contractual relationship illusory.
* * * * * * * *
We therefore hold that, even as a contract of adhesion, the language quoted above has limitations. The card can be revoked without cause and without any waiting period, but it cannot be revoked for transactions that already have occurred.
* * * * * * * *
Nor need we decide what fact situations would allow the communication of the cancellation to take place through the merchant involved in the transaction. If a cardholder seeks to use his American Express card to buy a car, for example, we think that a communication, through the car dealer, that the card has been cancelled prior to title passing to the cardholder may effect notice in reasonable fashion. But where the meal has been consumed, or the hotel room has been slept in, or the service rendered, the communication through the merchant comes too late to void the credit for that transaction.
Even contracts of adhesion are contracts. To allow cancellation without any communication of the decision is to turn the contract into a snare and deceit. It may well be that an offeree has less expectation of performance and that the terms and conditions of withdrawal of the offer can be, as American Express argues, much more absolute and ex parte. See Restatement (Second) of Contracts § 42 comment a. But contracts, as opposed to offers, are made of sterner doctrine; to interpret this contract so as to sanction the conduct of American Express in this case would empty the agreement of all meaning. [Id. at 18-20.]
At trial, CDC advanced several reasons for the adjustment of sales quotas. According to William Friend, CDC's manager of national accounts and sales support for BIS during 1984 and 1985, sales quotas were frequently adjusted downward to accommodate situations beyond the employees' control which removed any chance for them to achieve the original quota. Similarly, quotas were adjusted upward when factors became manifest which would, but for the quota adjustment, produce a windfall. He noted that he adjusted quotas downward 10 to 15 times more frequently than he increased them. Friend said that the considerations relevant in determining any given quota were "revenue potential, the seniority of the [employee and] the type of support they had. It was a subjective, very subjective type of setting of numbers."
*437 CDC alleges that Nolan's 1983 quota increase was due to the fact that he was assigned to a new sales territory which provided him with greater opportunity. Friend testified that the increase in Nolan's sales quotas during 1984 was within the range given to others within Nolan's AT & T marketing group. James Smith, CDC's Vice President of Sales and Marketing for BIS, claimed that Nolan's 1984 quota increases were justified by CDC's provision of increased sales support staff and other significant resource build-up. Smith also sought to justify Nolan's increased quotas on the grounds
that there were multiple opportunities that presented themselves due to the deregulation that existed in the old Bell system, Bell organization. There were two specific large systems that were either in place in '84 or expected to come on stream in '84 that we were bidding for. One was a system called Spot and one was a system called C.S.P. Customer Service System....
There were huge systems and huge opportunities relative to other opportunities that our business unit had. They were in the hundred of thousands of dollars, multiple, tens of thousands of dollars per month revenue opportunities. They were big accounts for us.
Nolan, on the other hand, complains that CDC's motivation in increasing his sales quotas was solely to "manage [his] income." Nolan states the obvious when he says that CDC's quota increases had the effect of reducing his income. Even if we were to accept Nolan's contentions, however, under the Tymshare principles managing income by increasing sales quotas is a legitimate business purpose if the employee would otherwise receive disproportionately high compensation that was not the result of his "extra sales efforts." Tymshare, 727 F.2d at 1154. While the factors which CDC asserts to justify Nolan's quota increases may not be altogether thoroughly convincing, its "genuine determination that one or another of these factors exists can presumably not be questioned." Tymshare, 727 F.2d at 1154. Conversely, Nolan may not have demonstrated that CDC's quota increases were animated by its "simple desire to deprive [him] of the fairly agreed benefit of his labors." Id.
We conclude that the best course here is to remand to the trial judge for reconsideration of her opinion on the claims for *438 additional compensation for 1983 and 1984, consequent upon the adjustments of sales quotas. The trial judge is in the best position to draw the inference of good faith and reasonableness or lack thereof from the testimony which she heard and from the witnesses whom she observed, given the principles of law which we have explicated on unilateral retrospective alterations in compensation agreements.
The judge recited in her written opinion that: "All [witnesses] were credible. Material facts are not disputed." She also concluded that "no factual basis has been shown in support of plaintiff's claim of fraud." She further expressed the belief that the "CDC practices and policies" shown by the evidence were "most unreasonable."
Given these mixed observations, we think it best to allow the trial judge to reconsider the matter on remand, after oral argument, in the light of the legal principles we find controlling. No additional proofs need be entertained. We are not in the best position to draw the inferences and conclusions necessary to finally decide the matter. See, e.g., Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 613, 560 A.2d 655 (1989). We do add the monition that the burden of establishing a breach of contract rests with the party who asserts the breach; a breach of contract will not be presumed. Doyle v. Northrop Corp., 455 F. Supp. 1318, 1329 (D.N.J. 1978); Shapiro v. Solomon, 42 N.J. Super. 377, 386, 126 A.2d 654 (App.Div. 1956).
[In redacted points II, III, IV the panel held that (1) the acceptance of the "final settlement" was not a waiver of any claims for 1984, (2) the 1985 claim was barred by the "settlement agreement" which constituted an accord and satisfaction of all claims for 1985, (3) Nolan's claim for an SRB bonus for 1984 was without foundation, and (4) the judge erred in dismissing CDC's counterclaim.]
Remanded for reconsideration of the issue of damages for compensation for 1983 and 1984 in light of the legal principles set forth in I and;
*439 Affirmed as set forth in II on the verdict in favor of CDC on the claim for damages for 1985;
Affirmed for the reasons stated in III on the denial of the claim for the SRB for 1984;
Reversed for the reasons sets forth in IV on the counterclaim for damages; remanded for entry of judgment in favor of defendant CDC in the amount of $7,350 and costs.
Jurisdiction is not retained.
NOTES
[1] See e.g. Schwartz v. Leasametric, Inc., 224 N.J. Super. 21, 30, 539 A.2d 744 (App.Div. 1988) (holding that no tort action would lie against an employer even if the employer fired employee to avoid paying him commissions.) This rule is subject to public policy limitations. See e.g., Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72, 417 A.2d 505 (1980) (providing employees with cause of action for wrongful discharge when the discharge is contrary to "a clear mandate of public policy.").