767 A.2d 989 (2001)
Cynthia L. MITA, Plaintiff-Appellant,
v.
CHUBB COMPUTER SERVICES, INC., Chubb Professional Resources, Inc. and Richard M. Sargent, individually and in his official capacity, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 7, 2001.
Decided March 2, 2001.
*990 W. Cary Edwards and Jamie P. Clare, Hawthorne, argued the cause for appellant *991 (Edwards & Caldwell, attorneys for appellant; Mr. Edwards, of counsel; Thomas G. Griggs, on the brief).
Brian D. Sullivan, New York City, argued the cause for respondent (Roberts & Finger, attorneys; Joel L. Finger, of counsel; Mr. Sullivan, on the brief).
Before Judges BAIME, WALLACE, and LINTNER.
The opinion of the court was delivered by BAIME, P.J.A.D.
Plaintiff appeals from a summary judgment dismissing her complaint for wrongful termination of employment. She asserts that defendants Chubb Professional Resources, its division Chubb Computer Services, Inc., and the division's chief executive officer Richard Sargent violated their agreement not to fire her for refusing to sign a non-compete clause. We disagree and affirm the summary judgment.

I.
Plaintiff commenced her employment with Chubb Computer Services in 1990 as a technical manager. She was subsequently promoted to operations director. Chubb trained and placed computer professionals with various businesses. Plaintiff's job was to recruit and assign such professionals in return for commissions.
At the time plaintiff was hired she signed an "Employee Acknowledgment" which evidenced her status as an at-will employee. The acknowledgment read:
The employment of any Chubb Programmer Resources employee can be terminated by Chubb Programmer Resources or the employee, with or without cause and with or without notice, at any time.
Plaintiff also received an employee handbook which re-emphasized her at-will status, stating in pertinent part:
The employment relationship which exists between The Chubb Institute and each of its employees is employment-at-will. Under this relationship, any employee is free to end his or her employment with The Chubb Institute at any time for any reason with or without prior notice. Likewise, The Chubb Institute may, at any time, decide to end an individual's employment with or without cause or prior notice, at its sole discretion.
This handbook sets forth certain procedures and guidelines which The Chubb Institute may or may not choose to follow. The statements and contents of this handbook are not promises of any kind by the Chubb Institute, and The Chubb Institute reserves the right to terminate an individual's employment with or without cause, or to charge wages and/or any other term or condition of employment of any employee without any prior consultation or agreement with any employee.
The handbook, amended in 1995, also outlined the procedure whereby an employee's status could be changed. The handbook stated that an employee's at-will status could be changed only by written documentation which: (1) was signed by Chubb Computer Services' President and the individual employee, (2) specifically named the individual employee, (3) expressly stated that the named employee was not employed at-will, and (4) set forth the specific duration and terms of the individual's employment by Chubb Computer Services.
In April of 1995, Chubb decided to expand the use of its non-compete clause throughout the organization to include those thought to be "major salespeople." In May of 1995, at a meeting conducted by her immediate supervisor, Henry Crouse, plaintiff and other sales representatives were requested to sign a non-compete agreement. The agreement stated in relevant part:
During the term of this agreement and for one (1) year following termination of *992 Employee's employment with [Chubb] for any reason, Employee will not directly or indirectly solicit or accept any business that is competitive with [Chubb] with respect to any of (15) customers of [Chubb] which will be identified by [Chubb] at the time of such termination.
Crouse informed those in attendance that they should review the non-compete agreement and formulate any questions, which would be addressed at a subsequent meeting.
A second meeting regarding the non-compete agreement was held in May 1995, with plaintiff in attendance. At this meeting, plaintiff and her fellow employees voiced their concerns regarding the agreement, and submitted a list of questions to Crouse about the ramifications for failing to sign the agreement. Crouse then consulted with Richard Sargent.
During a third meeting, Crouse presented plaintiff and the other employees with answers to many of their questions. Particularly, plaintiff was told that those employees who chose not to sign the non-compete agreement would have their commissions reduced by 15%. Crouse also stated that Chubb would not provide any sort of "package" for those employees who signed the agreement and were subsequently terminated. Plaintiff asked Crouse whether or not the 15% reduction was a "tradeoff," in that she would not be later fired for her refusal to sign. Crouse answered that he did not know, and would have to refer the question to Sargent.
Within a day or two of the third meeting, Sargent conducted a lunch meeting with plaintiff. Plaintiff attempted to convince Sargent that it was unnecessary for her to sign the agreement because she only placed computer professionals with a Chubb subsidiary[1]. Plaintiff and Sargent also discussed the consequences of plaintiff's refusal to sign the agreement. Plaintiff stated that Sargent told her she would not be fired if she did not sign the agreement. Plaintiff admitted, however, that Sargent never directly stated that she would not be fired in the future for not signing the non-compete clause. Plaintiff nevertheless "felt as though it was implied." Plaintiff stated that Sargent "gave [her] the impression ... that this problem was never going to come up again, that [she] was not going to be asked to sign this again, and that [she] would not be fired forit was an exchange."
After conferring with Sargent, Crouse memorialized the 15% reduction in commission in a memorandum to plaintiff dated May 17, 1995. The memorandum stated in relevant part:
If you choose not to sign the agreement your commission eligible account revenue will be reduced by 15% effective June 1, 1995. This reduction will affect all account revenue, not just new placement for future commissions.
The reduction of commissions for non-signature is a one-time levy, and will not be re-adjusted in the future.
This agreement is not to be viewed as a negative reflection on your performance, or lack of trust, but it is necessary to further protect the expanding interest of [Chubb].
Plaintiff, thereafter refused to sign the non-compete agreement, and her commissions were reduced by 15% starting in June 1995.
In July 1995 plaintiff was informed that Sargent had directed that she could not open new accounts with clients other than Chubb subsidiaries because of her failure to sign the agreement. Moreover, plaintiff was told that she would not be promoted or receive additional account responsibilities, and any salary increases would be reduced.
*993 In April of 1997, Eleanor May, director of human resources for Chubb, approached plaintiff and again requested that she sign the non-compete agreement. Plaintiff told May that she could not believe that this subject was coming up again because she had been penalized for the past two years for refusing to sign the agreement. Plaintiff asked May whether or not she could be fired for refusing to sign again, to which May responded "no, no, no, don't worry about that, you can't be fired."
On June 3, 1997, after completing a report regarding her contacts outside of Chubb, plaintiff was instructed to execute the non-compete agreement or she would be fired immediately. Plaintiff's requests to consult an attorney or take the form home were denied. Plaintiff refused to sign the form and was immediately fired.
Sargent stated that plaintiff was ordered to sign the non-compete agreement because he learned she and Crouse were attempting to form a company that would compete with Chubb. Sargent testified that the non-compete agreement was necessary to ensure Chubb's interests were protected. Plaintiff and Crouse formed a new company shortly after plaintiff's termination.[2]
Plaintiff brought this action, contending that defendants breached their agreement not to terminate her employment for her refusal to sign the non-compete clause. She also asserted that: (1) defendants committed fraud by repeatedly representing that she would not be fired, (2) defendants breached an implied covenant of good faith and fair dealing, (3) defendants were estopped from terminating her employment because of their promises not to do so, and (4) Chubb improperly withheld commissions to which she was entitled following her discharge.
The Law Division granted defendants' motion for summary judgment. The judge framed the issues in terms of whether: (1) plaintiff's evidence was sufficient to permit a rational factfinder to conclude that defendants promised plaintiff's employment would never be terminated for her refusal to sign a non-compete agreement and (2) if such a promise was made, was it enforceable. As to the first question, the judge found no credible evidence supporting plaintiff's claim that she had been promised she would never be terminated on the basis of her refusal to sign a non-compete agreement. With respect to the second issue, the judge concluded that even if such a promise had been made, it was not supported by adequate consideration. The judge further concluded that plaintiff's claims of breach of an implied covenant of good faith and fair dealing, fraud, and promissory estoppel were not supported by the evidence presented. Finally, the judge determined that plaintiff's right to commissions terminated upon her discharge.

II.
We first address plaintiff's argument that she was unlawfully discharged for refusing to sign the non-compete agreement. This contention hinges upon the factual claim that defendants promised plaintiff she would never be terminated for refusing to sign the non-compete provision. We agree with the Law Division judge that the evidence presented was not sufficient to permit a rational factfinder to resolve this factual issue in plaintiff's favor. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). The evidence was so "one-sided that [defendants] must prevail as a matter of law." Ibid.; see also R. 4:46-2.
We begin with the settled principle that "an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine." Witkowski v. Thomas J. Lipton, *994 Inc., 136 N.J. 385, 397, 643 A.2d 546 (1994); Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 191, 536 A.2d 237 (1988); English v. College of Medicine & Dentistry, 73 N.J. 20, 23, 372 A.2d 295 (1977); Savarese v. Pyrene Manufacturing Co., 9 N.J. 595, 600, 89 A.2d 237 (1952). An employment relationship "remains terminable at the will of either an employer or employee, unless an agreement exists that provides otherwise." Witkowski v. Thomas J. Lipton, Inc., 136 N.J. at 397, 643 A.2d 546 (citing Bernard v. IMI Sys., Inc., 131 N.J. 91, 105-06, 618 A.2d 338 (1993); Erickson v. Marsh & McLennan Co., 117 N.J. 539, 561, 569 A.2d 793 (1990)).
There are exceptions to the employment-at-will doctrine. For example, if a plaintiff can prove that an employment manual containing job security and termination procedures could reasonably be understood by an employee to create binding duties and obligations between the employer and its employees, the manual will constitute, in effect, a unilateral offer to contract that an employee may accept through continued employment. Woolley v. Hoffmann-La Roche, 99 N.J. 284, 309, 491 A.2d 1257 (1985). An employee manual can create an implied contract with some guaranty of job protection even where the employment relationship is otherwise at will. Jackson v. Georgia-Pacific Corp., 296 N.J.Super. 1, 11, 685 A.2d 1329 (App. Div.1996), certif. denied, 149 N.J. 141, 693 A.2d 110 (1997). Even where an employee manual does not create an implied contract, modification of the employment-at-will status may occur through oral promises of the employer. Reynolds v. Palnut Company, 330 N.J.Super. 162, 171, 748 A.2d 1216 (App.Div.2000). Testimonial evidence presented by an employee may suffice to establish that some degree of job security or protection was intended. Ibid.
An employer is free to change the terms of employment. Ackerman v. The Money Store, 321 N.J.Super. 308, 321, 728 A.2d 873 (Law Div.1998). This power includes the right to impose new requirements on the employee. See Alexander v. Kay Finlay Jewelers, 208 N.J.Super. 503, 507, 506 A.2d 379 (App.Div.), certif. denied, 104 N.J. 466, 517 A.2d 449 (1986); Anthony v. Jersey Central Power & Light Co., 51 N.J.Super. 139-145, 143 A.2d 762 (App. Div.1958). Moreover, an employment-at-will relationship may be changed by the parties following the commencement of the employment agreement. While it is true that an employer can discharge an at-will employee at any time and for any reason, "this principle is a consequence of the fact that the length of an `at will' employee's engagement is not controlled by contract." Nolan v. Control Data Corp., 243 N.J.Super. 420, 429, 579 A.2d 1252 (App.Div. 1990). This does not mean that the parties cannot limit the employer's power to discharge or similarly confine its authority with respect to other aspects of the employment relationship. Ibid.
We thus look initially to the original employment agreement to determine the parties' relationship. The acknowledgment and employee manual are crystal clear in that respect. Both documents stated unequivocally that plaintiff is an at-will employee and may be discharged at any time and for any reason. Moreover, the employee manual defined with precision the method by which the employment-at-will relationship could be altered, i.e., by a written document signed by Chubb's president and by the specifically named individual employee expressly stating the duration and specific terms of the worker's employment and stating that the employment is not at will.
While we have found no reported New Jersey decisions dealing with the precise issue, it is arguable that an employee manual can narrow and define the procedure or method by which an employment-at-will contract can be changed by the parties. Where an employee manual clearly and unequivocally provides the exclusive means by which an employment-at-will relationship can be altered, we perceive *995 no sound jurisprudential or public policy reason prohibiting enforcement. This principle derives from, and is corollary to, the rule first stated in Woolley v. Hoffmann-La Roche, 99 N.J. at 300, 491 A.2d 1257, that an employee manual may create an implied contract defining the employment relationship. Thus analyzed, "the manual is an offer that seeks the formation of a unilateral contractthe employees' bargainedfor action needed to make the offer binding being their continued work when they have no obligation to continue." 99 N.J. at 302, 491 A.2d 1257. In this context, however, the employee manual sets forth the conditions for employment. The employee, by continuing to work, accepts the employer's offer and the requisite conditions of employment.
We note the limited contours of our holding. The unilateral contract analysis is perfectly adequate for that employee who was aware of the manual and who continued to work intending that continuation to be the action in exchange for the employer's promise. Therefore, the conditions of employmentpreservation of the employee's at-will status and limitation of the mechanism to alter that relationship must be placed in a prominent position in the manual. Cf. Nicosia v. Wakefern Food Corp., 136 N.J. 401, 415, 643 A.2d 554 (1994) (a disclaimer that an employee manual is intended to convey a unilateral offer must be prominently displayed); accord: Woolley v. Hoffmann-La Roche, 99 N.J. at 309, 491 A.2d 1257; Falco v. Community Med. Center, 296 N.J.Super. 298, 319, 686 A.2d 1212 (App.Div.1997), certif. denied, 153 N.J. 405, 709 A.2d 798 (1998); Catalane v. Gilian Instrument Corp., 271 N.J.Super. 476, 494, 638 A.2d 1341 (App. Div.), certif. denied, 136 N.J. 298, 642 A.2d 1006 (1994); Preston v. Claridge Hotel & Casino, 231 N.J.Super. 81, 86, 555 A.2d 12 (App.Div.1989); Ware v. Prudential Insurance Co., 220 N.J.Super. 135, 143, 531 A.2d 757 (App.Div.1987), certif. denied, 113 N.J. 335, 550 A.2d 450 (1988). The typeface print size, heading, and the degree to which it is separated from other material or set off must be sufficient to attract the reader's attention. See Jackson v. Georgia-Pacific Corp., 296 N.J.Super. at 15, 685 A.2d 1329.
Further, there might be situations in which enforcement of such a provision would be unconscionable. We recognize that the employer and employee often have unequal bargaining positions. In other contexts, the doctrine of unconscionability has been developed and applied to protect the disadvantaged party in a one-sided, adhesion contract. Woolley v. Hoffmann-La Roche, 99 N.J. at 303 n. 9, 491 A.2d 1257 (citing S. Marrinan, Employment At-Will: Pandora's Box May Have an Attractive Cover, 7 Hamline L.Rev. 155, 193 (1984)). So too, an employer's conduct in conveying a promise of job security in order to forestall an employee's resignation may be so egregious as to require application of the doctrine of promissory estoppel notwithstanding the disclaimer in an employee manual. Ibid.; see also Restatement (Second) of Contracts § 590 (doctrine renders binding a promise when the promissor should reasonably expect the promisee or a third party to act or forbear to act in reliance on the promise, if the promisee or third party does so and justice requires).
Applying these principles, it is clear that the May 1995 memorandum was insufficient to effect an alteration of plaintiff's status as an employee-at-will. While the memorandum was signed by Chubb's chief executive officer, it did not expressly state that plaintiff was no longer to be regarded as an at-will employee. Nor did it set forth the specific duration and terms of plaintiff's employment. The memorandum did not comport with the employee manual's requirements pertaining to a change in an employee's at-will status.
We add for the sake of completeness that the memorandum does not support plaintiff's claim of a promise on Chubb's part never to fire her for refusing to sign a non-compete agreement. The *996 agreement does not say that plaintiff will not be terminated in the future for refusal to sign an agreement not to compete. Chubb never promised that it would not pursue the matter in the future. Nor does the parties' conduct suggest such an agreement. It will be recalled that plaintiff was approached shortly after the memorandum was issued and was again requested to sign the agreement. Plaintiff's continued refusal to sign a non-compete agreement evidenced her desire to maintain her at-will status. As we noted earlier, plaintiff ultimately formed a new company to compete with Chubb. If this case were permitted to proceed to trial, plaintiff's evidence could not withstand defendants' motion for judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. at 540, 666 A.2d 146 (citing R. 4:37-2(b)).

III.
Plaintiff's remaining arguments do not require extended discussion. R. 2:11-3(e)(1)(E). We have concluded that the evidence presented did not support plaintiff's claim she was promised she would never be fired for refusing to sign a non-compete agreement. While we harbor serious reservations concerning the Law Division judge's alternative holding that if Chubb made such a promise it was not supported by adequate consideration, we need not address that issue. Plaintiff's causes of action for fraud, breach of an implied covenant of good faith and fair dealing, and promissory estoppel are derivative of her contract claim for which we have found no basis. These claims clearly lack merit.
Finally, we reject plaintiff's argument that she was entitled to commissions following her termination. The Law Division judge properly dismissed this claim.
Affirmed.
NOTES
[1] It should be noted that defendants dispute plaintiff's claim that she was only marketing to this Chubb subsidiary. Defendants claim that plaintiff, in fact, had contact with at least nine independent clients.
[2] Unlike plaintiff, Crouse signed an anti-compete agreement. In unrelated litigation, the Chancery Division found that the noncompete clause was reasonable in its scope. The court enforced the anti-compete provision.