**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1385-21

ACRE MORTGAGE &
FINANCIAL, INC.,

     Plaintiff-Appellant,

v.

JOSEPH JAMES LANG IV, a/k/a JOE
LANG, JOSEPH LANG, and JOSEPH
J. LANG, NATION ONE MORTGAGE
CORPORATION, and GEORGE
DIFRANCESCO,

     Defendants-Respondents,

and

JOSEPH JAMES LANG IV and
NATION ONE MORTGAGE
CORPORATION,

     Third-Party Plaintiffs/
     Respondents,

v.

JOSEPH DICRISCIO and JOHN
MERLINO,

Third-Part Defendants/
Respondents.

_____

Argued June 1, 2023 – Decided November 6, 2024

Before Judges Accurso, Vernoia and Natali.

On appeal from the Superior Court of New Jersey,
Chancery Division, Burlington County, Docket No.
C-000073-17.

Mitchell Sandler LLC, attorneys for appellant
(Katharine T. Batista, on the briefs).

Daniel E. Rhynhart (Blank Rome LLP) of the
Pennsylvania bar, admitted pro hac vice, argued the
cause for respondents Joseph James Lang IV and
Nation One Mortgage Corporation (Blank Rome LLP,
Posternock Apell, PC, and Daniel E. Rhynhart,
attorneys; Stephen M. Orlofsky, Michael R. Darbee,
Daniel Posternock, and Daniel E. Rhynhart, on the
brief).

John A. Zohlman, III, argued the cause for respondent
George DiFrancesco (Hagner & Zohlman, LLC,
attorneys; John A. Zohlman III and YooNieh Ahn, on
the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

This appeal arises out of a dispute among the participants in a residential

mortgage market "net branch" system. Plaintiff Acre Mortgage Financial, Inc.

is a mortgage brokerage firm, owned by third-party defendants John Merlino

and Joseph DiCriscio, which sells mortgage loans originated by its net branches to investors in the secondary market. Although these Acre branches have no legal existence apart from Acre, they operate largely independently, with the branch manager assuming all responsibility for branch performance and retaining 100 percent of the branch's net profits. Defendant and third-party plaintiff Joseph James Lang IV managed an Acre branch in Marlton, doing business as Nation One Mortgage Corporation.

As Judge Fiamingo explained in her meticulously detailed sixty-nine-page opinion, Acre would credit Lang's branch "with the amounts paid by the secondary purchaser, less certain pass-through expenses due to Acre," such as fees for credit reports and flood searches, and Acre's per loan fee calculated as an agreed number of basis points on each loan sold, which Acre could adjust in its discretion. Acre deposited the balance into a segregated account maintained for Lang's branch from which "the salaries of the employees of Lang's net branch, operating expenses, such as rents and utilities for the office location, furnishings, fixtures and equipment, and all other costs associated with the office were paid." Although Lang was not a signatory on the account, and thus could neither deposit nor withdraw funds from it, he could, and did, monitor the funds moving in and out of the account. "Lang, as net branch

3

manager, was entitled to dispose of the amounts from the remaining profits of the net branch as he determined in his discretion, including distributing such amounts as compensation to himself, subject only to retaining a 'cushion' for operating expenses and other potential costs."

The dispute between Acre, Merlino and DiCriscio on one side and Lang and Nation One on the other arose when Lang left Acre in 2017 and established Nation One as a mortgage company competing with Acre. Central to the dispute was whether Acre and Lang's relationship was governed by the 2011 agreement they signed shortly after Lang joined Acre or a June 30, 2015 agreement signed on behalf of Acre by George DiFrancesco, Acre's national sales manager. DiFrancesco managed the day-to-day operation of all Acre branches, apart from Acre's own corporate branch, and was responsible for negotiating and executing agreements between Acre and its branch managers. DiFrancesco had signed the 2011 agreement between Acre and Lang on Acre's behalf.

Following Lang's departure, Acre sued Lang for breach of contract, breach of the duty of loyalty, and breach of fiduciary duty, and sued Lang and Nation One for violation of the Lanham Act, 15 U.S.C. § 1125(a), tortious interference with current contractual and prospective economic relations,

unfair competition, misappropriation of trade secrets in violation of New Jersey's Trade Secrets Act, N.J.S.A. 56:15-1 to -9, and violation of Defend Trade Secrets Act, 18 U.S.C. § 1836. Acre also sued DiFrancesco for breach of the duty of loyalty, and breach of fiduciary duty, and sued Lang and DiFrancesco for conspiracy, alleging the two fabricated Lang's 2015 branch agreement, which DiFrancesco signed without authorization and without Merlino and DiCriscio's knowledge

DiFrancesco counterclaimed for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and conversion, alleging Acre failed to pay him all his commissions and to tender his final paycheck.

Lang and Nation One asserted counterclaims against Acre for breach of contract, promissory estoppel, unjust enrichment, fraud, conversion, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, unpaid commissions, and violation of New Jersey's Wage Payment Law, N.J.S.A. 34:11-4.1 to -4.15. Lang and Nation One also filed a third-party complaint against Merlino and DiCriscio, asserting causes of action for fraudulent inducement, common law fraud, breach of fiduciary duty, indemnification, common law indemnification, and contribution.

A-1385-21

Judge Fiamingo presided over a twenty-day bench trial in the Chancery Division in which eleven fact witnesses and two experts testified, and 152 documents were admitted in evidence. She found Lang began operating the Marlton branch for Acre in late 2010, bringing in his own book of business and referral sources, as well as employees and office space. Lang had been in the business for several years and had operated his own mortgage company, thus requiring little assistance on Acre's part to get the branch up and running. The judge found Lang and DiFrancesco credibly "testified that should Lang leave Acre he would be able to 'leave as he came,' with his employees, office, leads, and referral sources," and that "Merlino and DiCriscio's testimony to the contrary" was not believable and at odds with other evidence about how Acre took on and shed net branches.

Although Acre and Lang initially operated without a written agreement, that changed in 2011 after the enactment of Dodd-Frank, 12 U.S.C. § 5301. The judge found Lang balked at signing the 2011 agreement Acre presented him, because it did not reflect their then-current arrangement. The judge accepted Lang's testimony that he only signed because Merlino told him it was the only way he was going to be paid and assured him "the deal would

6

continue as before despite any provisions in the 2011 Agreement to the contrary."

Judge Fiamingo found the credible evidence demonstrated the arrangement between Acre and Lang continued in the same manner as before "execution of the 2011 Agreement and as if that agreement had not been executed." She found Lang's "actual compensation arrangement bore no resemblance to that set forth in the 2011 Agreement and more closely resembled the arrangement described by Lang and DiFrancesco."

The parties stipulated that "[f]rom the time Lang was hired until 2012, Acre's fee for loans closed by Lang's branch was 58 basis points," well below the 150 basis points Acre charged other branches. Merlino testified the "aggressive pricing" was in expectation of the volume of business Lang would generate. When that expected volume failed to materialize, Acre increased Lang's per loan fee to 70 basis point in 2012. If Lang's branch closed over $10 million a month in loans, however, Acre paid Lang 12 basis points, effectively bringing Acre's fee back down to 58 basis points. That credit was discontinued in May 2015. Judge Fiamingo found "Lang did not dispute Acre's ability to unilaterally make those changes."

7

Lang ultimately became a top producer for Acre, becoming its most successful branch, representing 40 percent of Acre's total business by volume in 2016. Lang testified his relationship with Merlino and DiCriscio changed in 2014, however, when Lang "caught Acre stealing from [him]" by skimming fifty basis points off the purchase "advices" on loans Acre sold to The Money Source. Merlino testified Acre had negotiated a volume bonus of 50 basis points on loans sold to The Money Source to which Acre claimed it was entitled without passing through the savings on Lang's loans to Lang's branch.

Merlino testified DiCriscio was adamant that Lang wasn't entitled to the bonus Acre had negotiated with The Money Source. Merlino also testified, however, that Lang was incensed, and Merlino convinced DiCriscio that "it's probably better just to pay [Lang] to keep the peace." Thus, while denying any wrongdoing, Merlino and DiCriscio agreed to pay Lang the $168,000 in dispute. Judge Fiamingo found Merlino's testimony "that Acre 'just paid' nearly $200,000 in additional compensation to Lang" not credible.

Judge Fiamingo found in accordance with Lang's testimony "that he became suspicious of Acre's good intentions" after that dispute and uneasy about the 2011 contract he'd signed. The parties stipulated that in early 2015, Lang told Merlino, DiCriscio, and DiFrancesco he wanted a new contract, and

that they exchanged draft "Non-Originating Branch Manager Employment Agreements." At Lang's request, he met with Merlino and DiCriscio in March. DiFrancesco attended the meeting. Lang and DiFrancesco testified the four discussed Lang's arrangement with Acre and agreed on terms, with Merlino telling Lang to have his lawyer write up the agreement. Judge Fiamingo found Merlino and DiCriscio acknowledged a meeting took place but were vague on the details of what occurred and what they had agreed to. The parties vehemently disagreed over whether the agreement signed by Lang and DiFrancesco in 2015 was authorized and binding.

Lang and DiFrancesco maintained that after several rounds of negotiations, Lang's agreement with Acre was memorialized in the signed, written agreement dated June 30, 2015, with both men understanding that DiFrancesco had the authority to sign the agreement on behalf of Acre. Both also testified the June 2015 agreement was acknowledged by Acre and implemented, noting that about a month after the contract was executed Merlino was copied on an email in which the agreement was explicitly referenced.

Merlino and DiCriscio denied that any written agreement was signed in 2015. They testified they explicitly rejected Lang's draft agreement, and

9

DiFrancesco knew it. They also denied that DiFrancesco had the authority to sign any contract other than a form contract approved by Acre's attorneys, which the 2015 document was not. Both were forced to concede, however, that there was nothing either orally or in writing advising branch managers, or Lang in particular, that DiFrancesco's contracting powers were so limited. Although DiCriscio testified he "knew" Lang was paying DiFrancesco, suggesting Lang must have paid DiFrancesco to sign the contract, he presented no evidence to support that allegation, and both Lang and DiFrancesco denied it.

Judge Fiamingo credited the testimony of Lang and DiFrancesco on the issue of the 2015 agreement, rejected the testimony of Merlino and DiCriscio, and concluded the 2015 contract was enforceable against both Acre and Lang. The judge found DiFrancesco testified credibly that he'd been charged with negotiating and executing agreements between Acre and its branch managers and had done so regularly on Acre's behalf throughout his tenure. The judge specifically rejected as simply not credible "DiCriscio and Merlino's testimony that DiFrancesco's authority was limited to obtaining signatures on form contracts without revisions," noting Merlino's concession on cross examination

10

that DiFrancesco had signed hundreds of documents for Acre over the years and that Acre had only taken issue with the 2015 Lang contract.

The judge found that neither Merlino nor DiCriscio ever advised DiFrancesco that the draft agreements he and Lang exchanged, which the record established they'd received, were unacceptable to them. She believed DiFrancesco when he testified that he understood "the lack of response by Merlino and DiCriscio to Lang's repeated status requests [as] an indication of their 'not wanting to be bothered with the process,' and that they never provided him with any indication that they were not in agreement with the proposal." Judge Fiamingo concluded "[t]he credible testimony reveal[ed] that the terms of the 2015 Agreement represented the manner in which the Lang branch was operated during the four years preceding its execution, and more accurately reflected the agreement between the parties, and importantly, the terms which had been agreed to in the March 2015 meeting between the parties."

The parties agree that in late 2016, Lang met with Merlino to tell him he would be leaving Acre to start his own mortgage company at some point in the future. Merlino testified he told Lang to leave "the right way," meaning: "Don't steal my people and don't steal my deals." According to Merlino, he

and Lang shook hands on those terms, and Lang stated: "John, if I break anything on the way out, I'll pay for it." DiCriscio testified that he expected Lang would meet with Acre and "come up with a comprehensive plan" on what his exit would look like; what date he'd cease operating at Acre, "stop taking loans or talking to clients as Acre Mortgage, open his new company, and . . . how would we move forward and . . . get the loans . . . that were originated by us done, and just kind of go through the entire transition."

Lang denied Merlino told him "Don't steal my deals or my . . . people," and claimed the phrase didn't "even make sense," because "[t]he deals were mine, the leads were mine, the people were mine." Lang testified his conversation with Merlino addressed the logistics of his leaving, such as: Acre releasing the name Nation One, so Lang could begin the process of licensing his new company right away; his taking a few employees with him, in order to get Nation One off the ground; Lang's doing his "test cases" for HUD's approval while still at Acre; and the timing of his slowly winding down the loans in Acre's pipeline, and ramping up the Nation One pipeline in order for there to be an "orderly transition."

Lang testified Merlino "knew it was coming, and so he wasn't shocked." According to Lang, there was nothing "earth-shattering" about the discussion,

12

testifying "you've got to remember, they only ever made 70 basis points off me. So, you know, $10 million in loan volume, I would pay them $70,000." Lang testified Merlino thought Lang "could be gone in March," which Lang felt "was a very aggressive date," as he was thinking it would take him until June. Lang testified that given the nature of the mortgage business, and the lifecycle of a loan, there would be no way for him to leave abruptly without hurting borrowers; there had to be a transition process.

Although it is undisputed that in early 2017, Acre increased the fee Lang's branch was required to pay on each loan from 70 basis points to 150 basis points, and that Lang asked Merlino and DiCriscio around that same time to remove Nation One Mortgage from Acre's New Jersey license, Merlino and DiCriscio testified it was never clear whether or when Lang was going to leave Acre. They testified that although they were aware Lang was setting up his new company, he wavered about whether he was going to leave, and he never chose a departure date.

As to this dispute, DiFrancesco testified that on learning Lang intended to leave Acre and open his own company, he suggested to Merlino and DiCriscio that they develop an exit strategy, as had been done in the past when

13

branch managers left the company, which happened on a fairly regular basis.[1]
He testified Merlino and DiCriscio "were very reluctant" to do so, and that
DiCriscio had cursed Lang and said: "[N]o, we're not helping Joe start his own
business," after which DiFrancesco was "cut out of the loop."

DiFrancesco resigned in mid-April after Merlino and DiCriscio
attempted to have him sign an affidavit to the effect that Acre's 2015
agreement with Lang was a fraud perpetrated by Lang; that DiFrancesco
agreed to sign the document Lang presented him despite knowing its terms
would "never be acceptable by Acre"; and that Lang had made statements
acknowledging the 2011 Agreement remained in "full force and effect."
DiFrancesco left without another job. He remains working in the mortgage
industry but has never worked for Lang.

On April 3, 2017, Lang had a "soft opening" for Nation One. He
testified, however, that every borrower who had signed a loan application with
Acre remained at Acre and closed their loan with Acre, which was how he
understood the process should work, and how the process had worked in the
past with respect to other branch managers who left Acre. Later in April, Lang

---

[1] Lang's expert testified that net branch managers "tend to act and think like free agents" and are "not famous for sticking around at companies."

A-1385-21

provided Acre with a separation agreement his attorney had drafted consistent with a discussion he'd had with Merlino and DiCriscio in March. DiCriscio rejected the draft "unequivocally," and stated that Acre expected Lang to continue to comply with the terms of his 2011 employment agreement. DiCriscio testified the draft was "ludicrous" and "a non-starter" and "didn't reflect any of the conversations [they] were having at that point in time."

In early June, Acre sent Lang a separation agreement, which proposed a transition period starting retroactively on April 1, 2017, which DiCriscio testified at trial was a typo, as he'd maintained he'd had no idea Lang was operating his new business before July. Both Merlino and DiCriscio denied any knowledge that Lang was already operating Nation One when they sent him the separation agreement, or that they approved of his operating a competing business while still employed by Acre. Ten days later, Lang rejected the proposal through his attorney, and accused Acre of attempting to obstruct his departure while posturing for future litigation. He also provided a counterproposal to which Acre did not respond.

Lang continued to work at Acre for the next month, finishing up loans started with Acre, and getting Nation One off the ground. Acre terminated Lang's employment in mid-July, claiming it had learned that Lang had diverted

loans from Acre to Nation One. Lang denied any wrongdoing, testifying he was terminated because "[t]he transition was over," and "there was no more money to squeeze out of me." The employees from Lang's branch resigned the day after Lang was terminated. Acre sent them all termination letters the following day.

Judge Fiamingo dismissed Acre's claims against Lang and Nation One for violation of the Lanham Act and misappropriation of trade secrets under State and federal law, and against Lang for conspiracy. The judge found in favor of Acre on its claims against Lang for breach of contract, breach of the duty of loyalty, breach of fiduciary duty, tortious interference with current contractual and prospective economic relations, and unfair competition.

The judge found that although nothing in the 2015 agreement prohibited Lang from soliciting business "from all sources with whom he became associated during his employment" after his employment ended, "[n]othing in the 2015 Agreement permits such solicitation during the term of his employment." The judge found Lang was not "entitled to operate a competing branch while operating the Acre branch, except in connection with his termination of employment and preparation for competition with Acre

16

thereafter" and that "[d]oing so required that he solicit leads and referrals prior to his termination of employment in contravention of the 2015 Agreement."

Although Judge Fiamingo found "as a fact that Merlino and DiCriscio were aware of Lang's actions in establishing his new company and setting himself up to compete with Acre after his termination," she also found that "knowledge did not constitute any agreement or other acquiescence on their part to his competition with Acre while he was employed by Acre" and, indeed, that Acre did not give Lang permission "to breach the 2015 Agreement and to enter into competition with . . . Acre." Judge Fiamingo also found that Acre established Lang breached his fiduciary duty and duty of loyalty to Acre and engaged in the common law business tort of unfair competition by competing with his employer while still employed by the company.

Judge Fiamingo was also satisfied that Acre had proved Lang had interfered with Acre's current and prospective economic relations. The judge found that Acre had a reasonable expectation it would be paid its commissions on those loans Lang closed prior to the termination of his employment, and as to those loans on which it did not receive a commission, Lang tortiously interfered with Acre's reasonable expectations of economic advantage. Likewise, the judge found "Acre had such reasonable expectations with respect

17

to those loans which were in process prior to Lang's separation, but which thereafter closed with [Nation One] after Lang's separation." Thus, "to the extent that loans closed by [Nation One] subsequent to Lang's separation were reasonably anticipated to be closed for Acre's benefit, Acre's claim is also sustained."

Judge Fiamingo found that DiCriscio and Merlino were, without question, aware that Lang had started his new business when they sent him their proposed separation agreement in June. But she found, nonetheless, that neither their knowledge "nor Merlino's awareness of Lang's need to engage in test cases constituted their acquiescence with competition by Lang with Acre during any period that Lang was acting as its branch manager." The judge found the evidence clearly established "that Lang was well aware of Acre's reasonable expectations in this regard, and that Lang took efforts to hide the operation of his competing business from Acre knowing that Merlino and DiCriscio had yet to approve a transition plan." The judge further found that Lang knew Merlino and DiCriscio "were unlikely to agree to the proposal he eventually presented to them only after he had successfully completed his soft opening and was ready to engage in full scale competition with Acre."

A-1385-21

As to Lang's counterclaims against Acre, the judge dismissed Lang's claims for promissory estoppel, unjust enrichment, fraud, conversion, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and violation of New Jersey's Wage Payment Law.  The judge also dismissed all of Lang's third-party claims against Merlino and DiCriscio.

Judge Fiamingo found "Lang's claims of misrepresentations by Merlino and DiCriscio as to the 'transition' period after his November 2016 announcement disingenuous at best."  She found there was never an agreement as to the transition, "a fact of which Lang was fully aware."  Nevertheless, "Lang chose to forge ahead with his own plan, knowing full well he had no agreement with Acre."  Although acknowledging that Merlino and DiCriscio were aware "Lang was making efforts to commence his new business during this period," the judge found "Lang's assertion that Merlino and DiCriscio were aware of the extent of his activities [was] unsupported by the evidence."  The judge concluded that "Lang did not remain at Acre as a result of any representation made to him by Merlino or DiCriscio.  He remained at Acre only as long as necessary to complete [Nation One's] readiness to commence business."

A-1385-21

Judge Fiamingo concluded, however, that Lang established Acre had also breached the parties' 2015 Agreement "when it failed to pay the commissions due to Lang's branch for the period prior to his termination, which include[ed] the amounts to be paid for the loans closed for Acre and the funds remaining in the branch account, as well as the severance" due under the 2015 Agreement. The judge also found Acre breached the Agreement by failing to release the rights to the Nation One name after Lang's termination as required by the Agreement.

Acre sought damages of $3,602,288, which included: the application of 150 basis points on loans that were closed at Nation One, which Acre maintained should have closed with Acre; the disgorgement of Nation One's profit on secondary sales of those loans; the disgorgement of Nation One's origination fees for each of those loans; the forfeiture of the compensation Acre had paid to Lang between April 3, 2017 (the date of Nation One's soft opening) and the termination of his employment in July 2017; and the forfeiture of Lang's income that had been withheld by Acre (which Lang was seeking in damages).

Lang sought a total of $2,370,976 in damages, which included: $1,013,347.22 on ninety-six loans he closed at Acre, and which Acre sold on

the secondary market mostly before he left its employ; $506,638.64, representing the eighty basis points Acre had taken on every loan after February 2017, above the agreed-upon seventy; $850,991.74 in severance pursuant to the 2015 Agreement (if only seventy basis points were taken by Acre), or $744,464.39 (if 150 basis points were taken by Acre); and his final paycheck for July 2017, which Acre withheld.

Judge Fiamingo awarded Acre damages for Lang's unfair competition while still employed of 150 basis points on all the loans closed by Nation One prior to Lang's termination. Based on the evidence that Nation One closed loans totaling $7,823,982 during that period, the judge awarded Acre $117,359.73 ($7,823,982 x .015) for the loans closed by Nation One through July 11, 2017.

The judge also awarded Acre damages for loans closed by Nation One for the sixty-day day period after Lang's termination. Although finding the testimony about which loans originated with Acre and closed with Nation One "confusing at best," the court found "it likely that loans closed within a relatively short period of Lang's termination . . . had to have started the process during his employment with Acre and incredible to find otherwise." Accordingly, the judge awarded Acre damages of 150 basis points on the

A-1385-21

$10,075,303 in loans closed by Nation One between July 11, 2017 and September 4, 2017, or $151,129.55, for total damages of $268,489.28. The judge rejected Acre's claim for disgorgement of Lang's compensation, and its claim for disgorgement of Nation One's profits for the entirety of 2017 as "overreaching and not supported by any credible evidence."

As for Lang's use of the name "Nation One," Judge Fiamingo found the parties' disagreement was "disingenuous on the part of both Acre and Lang." On the one hand, it was clear "Acre had no real interest in the use of the name outside of Lang's branch"; on the other, "Lang's insistence on his right to . . . transfer [of the name] prior to his termination of employment . . . is not supported by the terms of the 2015 Agreement." Ultimately, the judge held Acre breached the parties' 2015 contract by never releasing the Nation One name, even after the termination of Lang's employment.

Judge Fiamingo found "Acre breached its agreement with Lang with respect to the amounts earned by Lang prior to his termination, and its failure to pay to Lang the balance remaining in the branch account, as well as the severance payment" provided in the 2015 Agreement. The judge awarded Lang damages of $1,013,347 for the loans Lang closed for Acre prior to his

termination, plus the balance remaining in the branch account of $166,055, for a total award of $1,179,402.

The court declined to award Lang any damages for the 80-point differential between the 150 basis points Acre charged Lang in 2017 and the 70 basis points it had previously charged him. Lang acknowledged Acre had the right to make that unilateral adjustment, and testified he had accepted it without argument. The judge also declined to award Lang the $744,464.39 severance payment due under the 2015 Agreement, finding "that such an award to a disloyal employee would be inequitable." Finally, the judge declined Lang's request for punitive damages and declined prejudgment interest to both parties.

Judge Fiamingo dismissed Acre's claims against DiFrancesco for breach of fiduciary duty, breach of the duty of loyalty, and conspiracy related to his involvement with Lang's 2015 Agreement. The judge also dismissed DiFrancesco's counterclaims for breach of the duty of good faith and fair dealing, unjust enrichment, and conversion. The judge, however, awarded DiFrancesco damages of $486,264 in unpaid commissions, on a breach of contract theory, on loans closed by Lang's branch and two others that joined Acre at the same time in 2010.

Although the judge found Acre also breached its contract with DiFrancesco by failing to tender his final paycheck, the judge did not calculate the amount due DiFrancesco on that claim. The judge denied DiFrancesco prejudgment interest, finding he made no effort to contest Acre's failure to make payment of the amounts due him, and indeed was "willing to forego that compensation, notwithstanding his resignation until Acre chose to embroil him in this litigation."

The facts on this point are largely undisputed. When DiFrancesco joined Acre in 2007, he signed an "Employment Offer Letter" from Merlino on Acre letterhead that reads as follows:

> Please accept this letter as an offer of employment with Acre Mortgage. We would like you to represent our company as our wholesale rep. Initially you will be responsible to generate wholesale business in any and all states in which we are licensed. As the company and this division grow, territories may be divided among others. You are also expected to help in our quest to recruit outside branches to Acre Mortgage. For this you will be paid the following compensation.
>
> For the first three months you will be paid a forgivable draw. This will be paid as follows:
>
> Month 1- $6000
> Month 2- $6000
> Month 3- $6000

In the event that you close enough loans that your commissions exceed the above noted draw, you will be paid the difference. If you do not close enough business to cover the draw, then this draw will be forgiven. After the first three months you will be paid a salary of $24,000 per yr and you will be paid 10 basis points for all loans that you close. You will be responsible to pay your own daily expenses. If there is a major expense that you incur we will reimburse you for that expense as long as it has been pre-approved by me or Joe DiCriscio. As a company policy, we contribute $100 per month to your health insurance and you will be responsible to pay the difference. When you recruit a branch that we decide to hire, you will be paid $500 when we receive their branch license from the state banking commission, and an additional $500 when they close their first loan.

We hope that you accept this offer of employment, as we feel that you will be an asset to our company.

DiFrancesco's job was to generate wholesale business in all states in which Acre was licensed and recruit new branches to the company. He was not a loan officer, however, so he did not close loans. Thus, although the offer letter referred to his receiving compensation on loans he closed, he was actually paid based on the production of others. That is, he was paid ten basis points on loans closed by branches he recruited or managed, plus $500 when the branch was licensed, and $500 when the branch closed its first loan.

In 2008, DiFrancesco's title changed to national sales manager; his duties and compensation did not change. He continued to recruit and manage

A-1385-21

branches for Acre, which included managing day-to-day branch operations, as well as managing the on-boarding and departures of branches, all of which involved independently negotiating and signing contracts on behalf of the company. The offer letter is the only written agreement between DiFrancesco and Acre.

Lang joined Acre with two other net branch managers, Ryan Barbalios and Rich Roney, with whom he had been working at another mortgage company. Like Lang, Acre charged Barbalios and Roney only 58 basis points for loans closed by their branches, a steep discount from the 150 basis points Acre charged other branches. DiFrancesco and Acre referred to Lang's, Barbalios', and Roney's branches as "the big three." DiFrancesco testified that when Acre was negotiating to bring them on, Merlino advised him that he would not receive a commission on any of the loans closed by any of the three branches because "the deal's too rich."[2]

---

[2] DiFrancesco did not dispute that Merlino told him before Lang, Barbalios and Roney joined Acre that he would not be receiving any commission on their loans. He only disputed at trial whether he'd been told that before his first meeting with them. DiFrancesco was impeached on that point with his deposition testimony. When asked at deposition how long that first meeting had been, DiFrancesco answered:

DiFrancesco testified he never agreed to that arrangement and always complained to Merlino about it. In 2012, when Acre increased the fee on "the big three" to 70 basis points, Merlino agreed that Acre would pay DiFrancesco 1.5 points on every loan they closed, capped at $1,500 per month. DiFrancesco testified he believed he was due 10 basis points on loans closed by "the big three," that he never agreed to take anything less, and had always believed "deep down" that Merlino would eventually pay him the 10 basis points DiFrancesco believed he was owed.

Judge Fiamingo found DiFrancesco's offer letter constituted an employment agreement that Acre was not free to unilaterally change. The judge rejected Acre's reliance on <u>Woolley v. Hoffman-LaRoche</u>, 99 N.J. 284 (1985), because "[i]n <u>Woolley</u> no written employment contract existed and the plaintiff was an at-will employee." The judge found "Acre misconstrue[ed] the relationship between it and DiFrancesco and his claim against it. DiFrancesco's claim is a breach of contract claim. There was an express

How long they wanted it to last or how I wanted it to last. I wanted it to be over in five minutes because I had to go get my kids, and the other part of that was I didn't even want to be in there because they had already told me I was not going to be compensated on the account.

contractual agreement between them which was never the subject of an express amendment."

Judge Fiamingo found "New Jersey courts . . . do not permit unilateral amendments to existing agreements to change material terms." Discover Bank v. Shea, 362 N.J. Super 200, 203 (Law Div. 2001). "A proposed modification by one party to a contract must be accepted by the other to constitute mutual assent to modify." County of Morris v. Fauver, 153 N.J. 80, 95 (1998). Because the judge found the offer letter constituted a bilateral contract between Acre and DiFrancesco that Acre was not free to modify without DiFrancesco's express consent, which Acre never sought or obtained, she concluded Acre had breached its agreement to DiFrancesco and awarded him damages.

Although DiFrancesco sought $688,054 in unpaid commissions on loans closed by the Barbalios, Roney, and Lang branches between 2011 and 2017, Judge Fiamingo ordered Acre to pay DiFrancesco ten basis points for loans closed by those branches beginning in 2013, finding any claim before that was barred by the six-year statute of limitations, for a total of $486,264. As already noted, the judge did not calculate or award any damages on

28

DiFrancesco's claim to his final paycheck, although finding he was entitled to that sum as well.

Acre appeals, raising only two issues:  that the trial court erred in failing to order "or even consider" that Lang disgorge his compensation as well as the profits made by Nation One during the period of Lang's disloyalty; and in finding Acre required DiFrancesco's consent to modify his compensation terms.  We find no error in the court's decision to decline to order equitable disgorgement against Lang and Nation One, but agree the court erred in finding Acre was not free to unilaterally alter DiFrancesco's compensation by excluding commissions on loans to be closed by "the big three" branches on their joining Acre.

Final determinations by the trial court following a bench trial "are subject to a limited and well-established scope of review."  Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011).  We will not overturn the court's "factual findings and legal conclusions . . . unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."  Ibid. (quoting In re Tr. Created By Agreement Dated Dec. 20, 1961, 194 N.J. 276, 284 (2008)).  That means "[w]e do not weigh the evidence, assess the

A-1385-21

credibility of witnesses, or make conclusions about the evidence." 160 West Broadway Assocs., LP v. 1 Memorial Drive, LLC, 466 N.J. Super. 600, 610 (App. Div. 2021) (quoting Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (alteration in original)).

Instead, we "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Balducci v. Cige, 240 N.J. 574, 594 (2020) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "[A]n appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Id. at 595. Our review of the trial court's legal conclusions, including legal interpretations and the legal consequences that flow from established facts, however, is plenary. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Because courts are afforded "broad discretion" in "fashioning equitable remedies that are fair and practical," including "the remedy of equitable disgorgement" for an employee's disloyal conduct, we review those

decisions only for abuse of discretion. Kaye v. Rosefielde, 223 N.J. 218, 221-22 (2015).

We reject as entirely without merit Acre's claim that the trial court failed to consider ordering Lang to disgorge his compensation and Nation One's profits during the three-month period preceding Lang's termination. We quote from Judge Fiamingo's opinion:

> "Just as the trial court's determination of the disloyalty claim mandates a fact-sensitive inquiry, so does its fashioning of a remedy." Kaye v. Rosefielde, 223 N.J. 218, 231 (2015). "Depending on the facts of the case, an employee's breach of the duty of loyalty can give rise to either equitable or legal relief." Cameco, Inc. v. Gedicke, 157 N.J. 504, 518 (1999). When there is a finding of a breach of fiduciary duty, the "egregiousness of the employee's conduct" affects the determination of the appropriate remedy. Id. at 517. Additionally, if equity so requires, a "trial court may order disgorgement of an employee's compensation as a remedy for a breach of loyalty in an appropriate case." Kaye, 223 N.J. at 222. Such disgorgement is appropriate only for the period during the employment when the employee has been disloyal. Ibid.

Acre sought both actual and equitable damages, including "[d]isgorgement of all compensation" paid to Lang during the period that he was acting for his and Nation One's "sole benefit and to the detriment of Acre," as well as "disgorgement of Defendants' profits in amounts to be proven." Judge Fiamingo awarded Acre all its legal damages, that is, 150 basis

31

points on the $7,823,982 in loans closed by Nation One during Lang's period of disloyalty totaling $117,359.73, and 150 basis points on the $10,075,303 in loans closed by Nation One during the sixty-day period following Lang's termination on July 11, 2017, totaling $151,129.55, for total damages of $268,489.28, finding the remainder of Acre's claim "overreaching and not supported by any credible evidence."  Acre would not have earned a penny more on those loans had Lang remained at Acre working solely on its behalf during that period.

The trial court found that, in addition to the 38 loans Nation One closed in the three months prior to Lang's termination, Lang had closed 205 loans for Acre for which Acre had failed to pay an aggregate of $1,013,347.22 in net profits to Lang's branch, after taking Acre's fee of 150 basis points on each loan, and failed to pay the $166,055 balance remaining in Lang's branch account.  Acre's argument that the court erred in finding that "Lang diverted nearly 18 million dollars in loans from Acre, stealing well over $250,000 dollars in profits," and yet "failed to appreciate Acre's position that forfeiture of compensation was an appropriate remedy," ignores that the court fully compensated it for all amounts due on those loans, relieved it of its obligation under the 2015 Agreement to pay nearly $750,000 in severance to Lang and

only ordered it to turn over to Lang the $1,013,347.22 in net profits due his branch for which Acre had already taken its fees and the $166,055 balance remaining in Lang's branch account — without interest. Given the net branch arrangement, disgorgement of Lang's salary would have worked a windfall to Acre as Acre didn't pay Lang a salary; Lang paid his own salary out of the net profits of his branch.

Having reviewed the trial transcripts and Judge Fiamingo's thorough and thoughtful opinion, we are confident she correctly applied the governing law to this complicated dispute and fairly found "both Acre and Lang to have been at least partially at fault" in the failure to adopt "a clear transition plan" for Lang's orderly departure "create[ing] a murky situation for all of the parties involved." We certainly cannot find she abused her considerable discretion in declining to order the equitable remedy of disgorgement on these facts. See Natovitz v. Bay Head Realty Co., 142 N.J. Eq. 456, 463 (E. & A. 1948) (noting the maxim "that he who seeks equity must do equity").

In contrast, we find the court made a legal error in concluding Acre was not free to unilaterally determine not to pay DiFrancesco ten basis points on loans to be closed by the Barbalios, Roney, and Lang branches. In concluding

33

the offer letter constituted a bilateral contract that Acre violated by changing the terms of DiFrancesco's compensation, the trial court erred.

DiFrancesco does not dispute the contract at issue is an offer letter. Although executed offer letters qualify as employment agreements, Hanisko v. Billy Casper Golf Mgmt., Inc., 437 N.J. Super. 349, 362 (App. Div. 2014), a writing alone will not alter the at-will nature of the employment. Our Supreme Court has unequivocally held that "in the absence of a contrary agreement, an employee is hired at-will, regardless of the way in which the salary is quoted in an offer letter." Bernard v. IMI Sys., 131 N.J. 91, 96 (1993).

Moreover, in the at-will employment context, employers retain the authority to alter the terms and conditions of employment, subject, of course, to any statutory or common law limitations. Mita v. Chubb Comput. Servs., Inc., 337 N.J. Super. 517, 526-27 (App. Div. 2001). And the employee's decision to remain employed, subject to the terms and conditions set by the employer, is deemed an acceptance of those terms. Martindale v. Sandvik, Inc., 173 N.J. 76, 88 (2002); Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 399 (1994); Woolley, 99 N.J. at 302; Mita, 337 N.J. Super. at 527. The law is well-settled that an employer's freedom to change the terms of at-will employment include compensation terms, Alexander v. Kay Finlay Jewelers,

208 N.J. Super. 503, 506-07 (App. Div. 1986), which new terms are presumed accepted by the employee once the employee becomes aware of the change and chooses to continue working, Mita, 337 N.J. Super. at 526-27.

We have no quarrel with the trial court's factual findings on this point. The evidence supports the court's finding that the April 2, 2007 offer letter constituted a contract, as it was written, signed by both parties, and it set forth the material terms of employment, particularly the terms of DiFrancesco's compensation. Hanisko, 437 N.J. Super. 362. Indeed, the court's post-trial opinion reflects that the parties stipulated that they entered into an employment agreement by virtue of the April 2, 2007, offer letter.

Nevertheless, the offer letter created only an at-will employment relationship between the parties. Bernard, 131 N.J. at 96. That is, the offer letter did not contain any limitation on Acre's right to terminate DiFrancesco's employment, nor any limit on its right to amend the terms or conditions of his employment. Therefore, Acre retained the right to modify the terms of employment, and the record reflects that Acre exercised that right with respect to DiFrancesco's compensation, specifically with regard to the Barbalios, Roney, and Lang branches.

A-1385-21

Acre did not breach any legal obligation to DiFrancesco by changing the terms of his compensation, because in every instance it made the changes prospectively. As stated by this court in <u>Winslow v. Corp. Exp., Inc.</u>, 364 N.J. Super. 128, 139 (App. Div. 2003):

> Because plaintiff was an at-will employee, defendant of course remained free to change the method by which plaintiff's commissions were calculated. [<u>Mita</u>, 337 N.J. Super. at 526.] However, defendant could only make such a change prospectively, after giving plaintiff prior notice that would afford him an opportunity to decide whether he wished to continue working at a reduced rate of compensation. <u>See</u> <u>Nolan v. Control Data Corp.</u>, 243 N.J. Super. 420, 430-32 (App. Div. 1990).

Specifically, as for the compensation to be paid DiFrancesco in connection with the Barbalios, Roney, and Lang branches: in 2010, Acre determined that DiFrancesco would not receive any compensation for loans closed by these branches; and in 2012, it decided to pay him 1.5 basis points on loans closed by these branches, capped at $1,500 per month. On each occasion, Acre made these changes prospectively, notified DiFrancesco of the change to the terms of his compensation, and explained the basis for its decision, which related to the basis points taken by Acre on loans closed by those branches. Each time, DiFrancesco orally objected to Acre's decision. Notwithstanding his objections, DiFrancesco's decision to remain employed by

A-1385-21

Acre, subject to the new compensation terms, constituted his acceptance of those terms. Mita, 337 N.J. Super. at 527. Accordingly, the judgment in favor of DiFrancesco on his breach of contract claim as to commissions owed with respect to the Barbalios, Roney, and Lang branches must be reversed and judgment entered for Acre on that claim.

There remains, however, the question of DiFrancesco's final paycheck. As to this issue, the court credited DiFrancesco's testimony that DiCriscio informed him "he would have to sue Acre to get his final paycheck and that Acre would bring DiFrancesco into the lawsuit" against Lang. The court further found: "Acre does not dispute that no payment was made for DiFrancesco's final period of employment and has provided no explanation for the failure to pay him other than the allegations set forth in their complaint."

Further, the court explicitly rejected Acre's claims against DiFrancesco, in which it sought the forfeiture of his salary for a period of disloyalty, stating: "[T]he court finds that DiFrancesco breached no duty he owed to Acre. DiFrancesco undertook all of his duties to his employer in an honorable and a loyal manner." Thus, the court correctly held that Acre was obligated to pay DiFrancesco his final paycheck, reflecting work he performed for the company through his resignation in April 2017. Because the court did not perform any

37

calculation of the amount due DiFrancesco for his final pay period, separate from the commission calculation for the Barbalios, Roney, and Lang branches, a remand is required for the court to determine the amount that remains owing to DiFrancesco.[3]

Affirmed in part, reversed in part and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] Unlike Lang, DiFrancesco did not assert a claim under New Jersey's Wage Payment Law, N.J.S.A. 34:11-4.1 to -4.14. We express no opinion as to whether DiFrancesco may be entitled to relief under that statute at this point. See Maia v. IEW Constr. Grp., 257 N.J. 330, 337 (2024) (addressing retroactivity of 2019 amendments to the statute).