**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0834-23

OCLAR PROPERTIES, LLC,

    Plaintiff-Respondent,

v.

ATLANTIC VIEW CEMETERY
ASSOCIATION, INC., TROY
NIKOLA, LARRY NIKOLA,

    Defendants-Appellants,

and

PLANNING BOARD OF THE
BOROUGH OF MANASQUAN,

    Defendant.

_____

Submitted January 14, 2025 – Decided May 6, 2025

Before Judges Gilson, Bishop-Thompson and Augostini.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. C-000087-21.

Coffey Modica LLP, attorneys for appellants (Robert Modica and Jessica Bornes, on the briefs).

Maggs McDermott & DiCicco, LLC, attorneys for respondent (Michael M. DiCicco and Stephanie L. DeLuca, on the brief).

PER CURIAM

This appeal arises from a dispute over the termination of a contract to purchase a portion of cemetery property located in Manasquan Borough and Wall Township. In 2014, plaintiff Oclar Properties, LLC, (Oclar), a property developer, entered into a contract (Agreement) with defendant Atlantic View Cemetery Association, Inc. (AVC) to purchase a portion of cemetery property to build and resell five single family residences. Defendant Troy Nikola[1] operates the cemetery and his father, defendant Larry Nikola, president of Memorial Properties, had a sales agreement with AVC to sell space in the cemetery, and in part, "administer[ed] different portions of [AVC's] business."

The Agreement provided two main contingencies, with specified time frames, before the sale of the property could be effectuated: (1) AVC obtaining approval of the New Jersey Cemetery Board (Cemetery Board) to sell a portion

---

[1] Because defendants Troy Nikola and Larry Nikola share the same last name, we use their first names in the opinion to avoid confusion, intending no disrespect.

A-0834-23

of the Property; and (2) Oclar obtaining subdivision approval from the Planning Board of the Borough of Manasquan (Planning Board).[2] The Agreement provided for both contingencies to be satisfied, including extensions, by April 2015.

AVC obtained the Cemetery Board's approval on September 23, 2014. Over the course of the next several years, both AVC and Oclar worked together, expending time and resources to obtain the necessary approvals from the Planning Board. However, Oclar did not obtain Planning Board approval. Five years later, in December 2020, AVC notified Oclar that it was terminating the Agreement because Oclar had not received the required approval.

On June 8, 2021, Oclar filed a complaint alleging various claims against AVC, including breach of contract and breach of the covenant of good faith and fair dealing, and seeking, in part, specific performance of the Agreement. Following trial, the court entered an order on September 20, 2023 granting judgment in favor of plaintiff, enforcing the Agreement, and detailing the next steps regarding enforcement of the Agreement.

---

[2] Although named as a defendant, the Planning Board did not participate in this appeal.

A-0834-23

For the reasons detailed below, we affirm the trial court's decision, finding that defendants improperly terminated the Agreement. We also affirm the trial court's ruling that the Agreement remained in full force and granting plaintiff's request for specific performance.

I.

We summarize the facts, which are largely undisputed, from the trial record. On July 11, 2014, Oclar and AVC entered into an Agreement regarding the purchase and development of property located in Manasquan Borough and Wall Township known as Atlantic View Cemetery, which includes Block 29, Lot 1 (the Property). Oclar planned to develop the Property into five single-family residence lots. The purchase price for the Property was $1,125,000, with an initial $20,000 deposit. The Agreement contained two specific contingencies that had to be met before the contract could be finalized: (1) the New Jersey Cemetery Board Approval Contingency; and (2) Development Approval.

Paragraph 5 of the Agreement set forth these "Approval Contingencies":

> A. New Jersey Cemetery Board Approval Contingency: The within Agreement and the obligation of the Seller hereunder is conditioned upon the receipt of the approval of the New Jersey Cemetery Board ("NJCB") as required by N.J.S.A. 45:27-34 ("NJCB Approval") upon such terms and conditions satisfactory to the Seller. The Seller shall within thirty (30) days of the date of this Agreement submit an application to the

4

NJCB for the purpose of obtaining the NJCB Approval and to diligently pursue same. The Seller shall be solely responsible for obtaining such approval and shall pay all costs related to same. Seller shall have three [] months from the date of this Agreement, to obtain the Approval. The Seller shall be permitted two [] extensions of two [] months each to obtain the NJCB Approval upon written notice to the Buyer given [no] later than ten [] days prior to the expiration of the initial or extended NJCB Approval contingency period, provided, however, that the Seller demonstrates to the reasonable satisfaction of the Buyer that it is diligently pursuing the Approval.

Once AVC obtained the Cemetery Board's approval, Oclar, the buyer, was responsible for obtaining "final and unappealable subdivision approval," authorizing the Property to be subdivided into five individual lots. Paragraph 5(B) of the Agreement detailed Oclar's obligation to obtain "Development Approval" and the time frames regarding same:

B. . . . Buyer's obligations under this Agreement are contingent upon and subject to Buyer obtaining final and unappealable subdivision approval to subdivide the Property from Block 29, Lot 1 and into five [] individual building lots as will permit the construction of a single[-]family residence on each of said lots from Manasquan Borough (the "Development Approval"). The Buyer shall be solely responsible for obtaining the Development Approval and shall pay all costs related to same. Buyer shall have three [] months from the date Seller gives Buyer written notice that it has received the NJCB Approval, to obtain the Development Approval. The Buyer shall be permitted two [] extensions of two [] months each to obtain the

5

Development Approval upon written request to the Seller received by the Seller not later than ten [] days prior to the expiration of the initial or extended Development Approval contingency period, provided, however, that the Buyer demonstrates to the reasonable satisfaction of the Seller that it is diligently pursuing the Approval.  It is expressly understood and agreed that the posting of performance guaranties, submission of conforming architectural plans, other conditions of approval such as utility extension permits and the submission of application(s) for a building permit are not [] conditions of Approval, but are the responsibility of the Buyer.  Buyer shall diligently pursue obtaining the Approval.  Buyer shall within [t]hirty [] days of notice to it of the satisfaction of Seller's NJCB Approval submit completed applications to secure the Development Approval.  The Buyer shall notify the Seller when Buyer has made [the] application for the Approval; the Seller shall have the right upon reasonable notice to inspect and review all submissions of the Buyer made in pursuance of the Approval and Buyer shall provide access for such inspection(s) and review(s) at a location in the general vicinity of the Property, it being agreed that the office Buyer's attorney set forth below is an acceptable location for such inspection and review.  In the event that this Agreement is terminated prior to a settlement and conveyance of the Property to the Buyer, Buyer shall provide the Seller with a copy of all applications, studies, reports, surveys and engineering data pertaining to the Property for such use as Seller shall determine without cost or charge of any kind.

Paragraph 5(C) of the Agreement also provided a termination provision in the event the necessary contingencies were not met:

6

In the event the Buyer or the Seller has not obtained the approvals within the contingency periods set forth above, or any agreed upon extension thereof, either Buyer or Seller may terminate this Agreement. Should either party determine that the approval to be obtained by that party shall not be forthcoming on terms and conditions reasonably acceptable, such party may discontinue the approval process and terminate this Agreement whereupon the deposit shall be refunded to the Buyer and upon the making of such refund, the within Agreement shall be deemed to be null and void, and the parties hereto shall have no further liability to each other hereunder except for such matters as are specifically provided to survive termination or settlement.

On September 23, 2014, AVC secured the Cemetery Board's approval and shortly thereafter, advised Oclar of the approval. Oclar began preparing the subdivision application to submit to the Planning Board, which was filed on November 19, 2014. A series of Planning Board hearings occurred in 2015.

On June 3, 2015, the Planning Board raised for the first time that the request required a use variance. Thus, the Planning Board denied Oclar's application. Oclar's attorney, Kevin Starkey, who prepared the application and presented it to the Planning Board, described this development as a "bomb dropping." After the meeting, Starkey advised the parties of the options to refile the application seeking a use variance or to file an appeal of the Planning Board's decision.

A-0834-23

Oclar and AVC agreed to appeal the Planning Board's decision, and on July 1, 2015, filed their first complaint in lieu of prerogative writs (2015 Prerogative Writs) challenging the Planning Board's decision. In a March 2, 2016 order, the court determined that the Planning Board properly required a use variance, denied Oclar's motion for summary judgment, and dismissed the complaint. The matter was remanded to the Planning Board.

In May 2016, the parties agreed to resubmit an application to the Planning Board, this time for a use variance. Additionally, the Planning Board had an issue with the trailer on the Property, which AVC used to meet with families, and wanted it removed. AVC wanted to replace the trailer with an office building and doing so required a site plan application. Therefore, Starkey, seeing both applications as "intertwined," agreed to represent both Oclar and AVC on their respective applications before the Planning Board. According to Starkey, AVC intended to use the proceeds from the sale of the subdivide Property for the "purposes of making improvements that were on the site plan [and] replacing the trailer."

In August 2016, the parties proceeded with the AVC's site plan application and Oclar's use variance application. The Planning Board held

8

several hearings on the second application on October 18, 2016, November 15, 2016, May 15, 2017, July 25, 2017, and August 15, 2017.

In May 2017, in the midst of the application process for the site plan and use variance, the parties agreed to amend the original Agreement (Amended Agreement) to increase the purchase price by $50,000. One of the concerns raised previously by the Planning Board during the first application process related to drainage issues. The "increase in [purchase] price was intended to allow AVC to address the construction of drainage improvements on the Remainder Property . . . ."

"On August 15, 2017, the Planning Board denied the use variance aspect of [the application] and did not vote on any other aspect of the application." Immediately after this hearing, Oclar asserted that it met with Troy and Larry Nikola and Starkey to discuss the only option, which was to file a second complaint in lieu of prerogative writs (2017 Prerogative Writs), challenging the Planning Board's denial. On October 3, 2017, the Planning Board adopted a resolution memorializing its denial of the use variance.

The parties agreed to proceed with the 2017 Prerogative Writs, which Starkey filed on November 17, 2017, on behalf of both AVC and Oclar. Starkey

testified that his office would have provided both Troy and Larry Nikola with a copy of the filed complaint.

The 2017 Prerogative Writs action proceeded, and in January 2019, the court conducted a conference and advised that it was inclined to remand the matter to the Planning Board.  The court suggested, however, that the parties confer regarding a potential settlement.  More substantive settlement discussions resumed in early 2020 after Starkey relayed that the Planning Board had proposed several infrastructure improvements.

As a result of these discussions, Starkey testified that "we got to a point where we had . . . a term sheet" outlining the agreed upon terms.  In an email dated March 24, 2021, to Larry, Troy, and Neil Ducharme, owner and managing member of Oclar, Starkey detailed the proposed settlement agreement with the Planning Board as agreed by the parties.

Starkey acknowledged that before he sent the email on March 24, 2021, he had received a letter from John Rihacek, Esq., dated November 25, 2020, advising that AVC was terminating the Agreement "pursuant to Paragraph 5C" because "no approvals [have been] obtained within the above time periods and extensions . . . ."  Oclar and Starkey maintained that they were surprised by this

notice and at no time prior to the receipt of this letter had defendants advised them of their desire to terminate the Agreement.

Larry and Troy testified that they had forgotten about the Agreement and did not think the Agreement was in effect because of the lengthy passage of time the matter had been pending without resolution. They contended that they were reminded of the Agreement when the AVC bookkeeper asked Larry about the $20,000 deposit.

A six-day bench trial was conducted from August 9, 2022 through September 15, 2022. On September 20, 2023, the trial court issued its decision on the record in favor of Oclar and issued a conforming order on the same day.

After reviewing the evidence and making credibility findings, the court found the doctrines of waiver and equitable estoppel barred defendants from terminating the Agreement. The court further concluded that defendants' attempt to terminate was a breach of the Agreement and found that by failing to communicate with Oclar and "simply [sitting] back and [doing] nothing" from 2017 to 2020, defendants breached the implied covenant of good faith and fair

11

dealing.  Thus, the court concluded that defendants improperly terminated the Agreement.

In a September 20, 2023 order, the court granted Oclar's relief, finding the Agreement in full force and effect and granting Oclar's application for specific performance of the Agreement.  Further, the court permitted the Planning Board to proceed with "a public meeting at which a <u>Whispering Woods</u>[3] hearing on the proposed settlement shall be conducted . . . ."  The court prohibited AVC from objecting to the conditions of the settlement to which it had previously agreed or that have no impact or effect on its Property but AVC could object to new items not delineated in the order.  Finally, the court directed AVC to convey the Property to "[Oclar] upon the approval of the subdivision, site plan, and use variance applications by the Planning Board . . . within [thirty] days of the expiration of the period of time to challenge that approval in [c]ourt . . . ."

On appeal, defendants raise six arguments, with subparts.  They argue the trial court erred by:  (1) finding that defendants breached the contract; (2) not

---

[3] <u>Whispering Woods at Bamm Hollow, Inc. v. Twp. of Middletown Plan. Bd.</u>, 220 N.J. Super. 161, 175 (Law Div. 1987) (a "Whispering Woods hearing" refers to a public hearing before a planning board where terms of a settlement agreement involving a land use application subject to litigation are considered by the board with notice to, an opportunity to be heard by the public, a public vote and resolution addressing the settlement agreement.)

A-0834-23

finding that AVC had not waived the right to terminate the contract, and was not equitably estopped from doing so; (3) not finding that even if AVC had waived its right to terminate or was equitably estopped from doing so, Oclar failed to prove its right to specific performance; (4) if specific performance was the appropriate remedy, the court should have allowed for a price adjustment, especially because Oclar had not performed in nearly ten years; (5) Oclar cannot enforce an unwritten, unsigned, vague modification of the Agreement, preventing AVC from objecting to conditions of the Agreement; and (6) there was no basis for an injunction preventing AVC from objecting to the conditions of the settlement at a Whispering Woods hearing.

## II.

We afford deference to the factual findings of a trial court, which is "especially appropriate 'when evidence is largely testimonial and involves questions of credibility.'" Balducci v. Cige, 240 N.J. 574, 594 (2020) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "That is so because an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Id. at 595.

In contrast, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special

deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (alteration in original) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Likewise, a trial court's interpretation of a contract is reviewed de novo. Serico v. Rothberg, 234 N.J. 168, 178 (2018). As to fashioning a remedy, the Chancery Division has broad discretionary power to adapt equitable remedies to the particular circumstances of a case. Kaye v. Rosefielde, 223 N.J. 218, 231 (2015).

A. AVC's Contractual Right to Terminate the Contract.

AVC contends that the specific language of paragraph 5(C) of the Agreement permitted AVC to terminate the Agreement if the contingency approvals Oclar was obligated to secure were not obtained within the requisite timeframe. Because this termination provision had no deadline by which AVC was required to submit a termination notice, AVC argues service of a termination notice could occur at any time and not constitute a breach of contract. We are not persuaded by this argument.

"To establish a claim for breach of contract, a plaintiff must provide proof of 'a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and a breach causing the claimant to sustain[] damages.'" Nelson v. Elizabeth Bd. of Educ., 466 N.J. Super. 325, 342

(App. Div. 2021) (alteration in original) (quoting EnviroFinance Grp., LLC v. Envtl. Barrier Co., 440 N.J. Super. 325, 345 (App. Div. 2015)).  "[T]he burden of establishing a breach of contract rests with the party who asserts the breach; a breach of contract will not be presumed."  Nolan v. Control Data Corp., 243 N.J. Super. 420, 438 (App. Div. 1990).  "The obligation to perform in good faith exists in every contract, including those contracts that contain express and unambiguous provisions permitting either party to terminate the contract without cause."  Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 421 (1997) (holding that the jury could have reasonably found that a party breached its obligation to perform its duties in good faith given its conduct during termination) (citing United Roasters, Inc. v. Colgate–Palmolive Co., 649 F.2d 985 (4th Cir. 1981)) (holding that the jury could have reasonably found that a party breached its obligation to perform its duties in good faith given its conduct during termination); see Wolf v. Marlton Corp., 57 N.J. Super. 278, 285 (App. Div. 1959) (explaining a breach of contract is present "where one party to a contract[,] by prevention or hindrance, makes it impossible for the other to carry out the terms thereof").

The trial court focused on AVC's conduct over the course of years and correctly concluded that under Sons of Thunder, "every party to a contract has

responsibilities and a right and an obligation to proceed in good faith." A party to a contract can fail to honor those obligations in terminating a contract just as one can in the ordinary performance of a contract. Sons of Thunder, Inc., 148 N.J. at 424.

Pursuant to the terms of the Agreement, the deadline for Oclar to obtain the subdivision approvals expired in April 2015. After this deadline lapsed in 2015, AVC authorized, participated in, and agreed to actions designed to obtain the Planning Board's approval of the subdivision application. Further, in July 2015, AVC approved the filing of the first prerogative writs complaint after the Planning Board denied the subdivision application.

Next, in 2016, AVC authorized and participated in the filing of a second prerogative writs action after the Planning Board denied the use variance application. In 2017, AVC negotiated an amendment to the Agreement, which increased the contract price by $50,000. With each step, AVC's conduct evidenced a desire to move forward with the project and Oclar relied upon AVC's conduct and representations. Viewing AVC's attempt to terminate the Agreement in the context of their behavior over several years, the trial court's conclusion that this conduct amounted to a breach of contract and the covenant of good faith and fair dealing is supported by the credible evidence in the record.

A-0834-23

B.  Doctrines of Waiver and Collateral Estoppel.

AVC argued that it maintained its right to terminate the Agreement, and the trial court erred in finding that the doctrines of waiver and equitable estoppel barred AVC's attempt to terminate the Agreement.  AVC further argued that any waiver would have been temporary and not permanent.  We discern no error in the trial court's application of these doctrines to the circumstances in this case.

"Waiver is the voluntary and intentional relinquishment of a known right." Knorr v. Smeal, 178 N.J. 169, 177 (2003) (citing W. Jersey Title & Guar. Co. v. Indus. Tr. Co., 27 N.J. 144, 152 (1958)).  "An effective waiver requires a party to have full knowledge of his legal rights and intent to surrender those rights." Ibid. (citing Indus. Tr. Co., 27 N.J. at 153).  "The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference." Ibid. (citing Merchs. Indem. Corp. of N.Y. v. Eggleston, 68 N.J. Super. 235, 254 (App. Div. 1961)).

The doctrine of equitable estoppel "is invoked in the interests of justice, morality and common fairness."  Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 189 (2013) (quoting Knorr, 178 N.J. at 178).  Equitable estoppel "is a theory 'designed to prevent injustice by not permitting a party to repudiate a course of

action on which another party has relied to his detriment.'" Id. at 179-80 (quoting Knorr, 178 N.J. at 178). Unlike the doctrine of waiver, equitable estoppel requires the reliance of one party on another. Country Chevrolet, Inc. v. Twp. of N. Brunswick Plan. Bd., 190 N.J. Super. 376, 380 (App. Div. 1983). "In short, to establish equitable estoppel, plaintiff[] must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiff[] acted or changed their position to their detriment." Knorr, 178 N.J. at 178 (citing Miller v. Miller, 97 N.J. 154, 163 (1984)). The party asserting estoppel "need not prove a promise, but may rely on conduct, inaction, representations of the actor, . . . misrepresentation, silence or omission." Fairken Assocs. v. Hutchin, 223 N.J. Super. 274, 280 (Law Div. 1987).

Both doctrines operate to prevent an unjust result. "Conduct may operate as a waiver" or to prevent a particular course of action even where there is no written modification. Salvatore v. Trace, 109 N.J. Super. 83, 91 (App. Div. 1969). The trial court concluded that the conduct of and representations made by both Troy and Larry "jointly" bound AVC. Moreover, Oclar clearly relied on AVC's conduct that it was not exercising its right to terminate under Paragraph 5(C), resulting in years of proceedings at Oclar's expense. The record

18

supports the trial court's conclusion that while the litigation challenging the Planning Board's denial of the use variance was pending, AVC decided to terminate the Agreement in November 2020 because it was no longer in the best financial interest of the cemetery to proceed with the development application and Agreement. The record further supported the trial court's finding that AVC "calculated that they could make a larger profit if they simply canceled this contract" and not because Oclar had failed to obtain the necessary approvals.

Based on Oclar's conduct and representations over many years, we are satisfied the trial court did not err in concluding that AVC waived its right to terminate the Agreement and was estopped from asserting the failure to obtain the approvals as a basis for termination.

C. Specific Performance.

AVC contends the trial court erred in ordering specific performance of the Agreement because of the parties' inability to close. AVC argues further that even if specific performance is the appropriate remedy, the court should have allowed for a price adjustment given the many years of Oclar's non-performance.

To establish a right to specific performance, a plaintiff must demonstrate: (1) the contract is valid and enforceable, Jackson v. Manasquan Sav. Bank, 271 N.J. Super. 136, 144 n.8 (Law Div. 1993), (2) that the contract's terms are

19

"expressed in such fashion that the court can determine, with reasonable certainty, the duties of each party and the conditions under which performance is due," Salvatore, 109 N.J. Super. at 90, and (3) "that an order compelling performance of the contract will not be 'harsh or oppressive,'" Marioni v. 94 Broadway, Inc., 374 N.J. Super. 588, 599 (2005) (quoting Stehr v. Sawyer, 40 N.J. 352, 357 (1963)); Ridge Chevrolet-Oldsmobile, Inc. v. Scarano, 238 N.J. Super. 149, 155 (App. Div. 1990).

The court must additionally decide whether "the performance of the contract represents an equitable result" by "'apprais[ing] the respective conduct and situation of the parties . . . .'" Marioni, 374 N.J. Super. at 599-600 (quoting Friendship Manor, Inc. v. Greiman, 244 N.J. Super. 104, 113 (App. Div. 1990) (specific performance is a "discretionary remedy resting on equitable principles")).

AVC argues that specific performance should not have been ordered because "compliance rests upon the will or discretion of an uncontrolled third party, particularly a governmental body." Ridge Chevrolet-Oldsmobile, Inc., 238 N.J. Super. at 156-57 (quoting Dworman v. Mayor & Bd. of Aldermen, etc., Morristown, 370 F. Supp. 1056, 1077-78 (D.N.J. 1974)); see Popular Refreshments, Inc. v. Fuller's Milk Bar, 85 N.J. Super. 528, 540 (App. Div.

1964) (where subdivision approval was an implied condition of the contract and it was not fulfilled, specific performance was properly denied).

However, in some cases, specific performance is appropriate even when governmental approval is required. Gulf Oil Corp. v. Montanaro, 94 N.J. Super. 348, 353 (Ch. Div. 1967). As the court in Gulf Oil stated:

> Defendant contends that equity may not order specific performance of a contract where compliance rests in the will or discretion of a third party uncontrolled by defendant. But here, since the planning board has approved the subdivision, this objection has been rendered academic and should no longer serve as a bar to the court's granting of specific performance. Then, too, even if subdivision approval had not as yet been obtained, it would appear that the granting of specific performance might nevertheless be ordered by the court but entry of judgment be withheld until subdivision approval actually issued.
>
> [Ibid.]

In Gulf Oil, the condition precedent had been met by the time the court decided the case and ordered specific performance. Ridge Chevrolet-Oldsmobile, Inc., 238 N.J. Super. at 157.

Here, the court credited the testimony of Starkey, who testified that the parties and the Planning Board had reached a settlement agreement that was acceptable to everyone, and "[t]he one hurdle left [was] to have a Whispering Woods hearing before the Planning Board," which Starkey believed, based on

21

his "discussions with the Planning Board attorney," would be "favorably received" and "approved" by the Planning Board.

As Oclar points out, this hearing was further delayed by AVC's attempt to terminate the Agreement. Thus, "in gauging the impact of any claimed oppression resulting from an award of specific performance, it is important to distinguish between those situations where the hardship came about because of the acts of the plaintiff or because of the acts of the defendant." Marioni, 374 N.J. Super. at 618-19. If the acts that created the hardship were done by the direction of the party against whom the remedy is sought "or under his control, the oppressive character of the performance cannot be a valid objection to a specific performance of his agreement." Id. at 619.

Under these circumstances, the trial court determined that the process of approval should continue, and AVC should not prevent the Whispering Woods hearing from proceeding. While the court recognized that the ultimate decision will be governed by the results of the hearing, the court determined that the development application should proceed. We discern no reversible error in that determination.

AVC argues that even if specific performance is the appropriate remedy, a price adjustment is appropriate to avoid the harsh and unfair result given the years that have lapsed and Oclar's failure to secure the requisite approvals.

A court of equity has broad discretion in fashioning a remedy to avoid "undue hardship in light of the evolving circumstances" surrounding a property dispute. Marioni v. Roxy Garments Delivery Co., Inc., 417 N.J. Super. 269, 273 (App. Div. 2010) (citing Marioni, 374 N.J. Super. at 622) (acknowledging that more than three years had transpired during which the seller had repaired, renovated, and leased the property and increasing the purchase price, considering interest, additions to the property, and operating costs, while subtracting rental payments). Here, AVC provided no proof of the increased value of the Property. The lack of evidence demonstrating the amount of an increase undercuts defendants' contention. Moreover, the parties agreed once to an increase in the purchase price of $50,000 due to improvements to the Property. We are satisfied that the court did not abuse its discretion in not adjusting the purchase price.

D. Enforcement of the Settlement Agreement and Restrictions on AVC's Ability to Object.

Finally, AVC contends that the court erred in enforcing terms of an unwritten, unsigned settlement agreement and prohibiting AVC from objecting

to these terms. The trial court found that "Mr. Starkey negotiated with the Borough of Manasquan in good faith and effectuated incredibly modest changes in order to get this development application approved." Crediting the testimony of Starkey, the court determined "that Mr. Starkey negotiated these [changes] in good faith with the knowledge and approval of the plaintiffs. And that to the extent that [] defendants were not aware of these [changes], . . . these changes do not substantially affect the operation of the cemetery . . . . "

The trial court's finding that Starkey negotiated these terms "in good faith" on behalf of AVC and Oclar is supported by the credible evidence in the record. During his testimony, Starkey detailed the ongoing steps he took on behalf of both parties to finalize the project. Those steps included: filing applications before the Planning Board, attending and presenting evidence at Planning Board hearings, filing the second prerogative writs action challenging the Board's denial of the use variance, and negotiating settlement terms to present to the Planning Board at a Whispering Woods hearing to resolve the matter. Starkey testified that the parties had gotten to the point of a draft agreement, which he characterized as similar to a "term sheet," and were at the point of signing when AVC decided to terminate the Agreement. In fact, Starkey forwarded an email to Larry, Troy, and Neil Ducharme from the Planning Board's attorney detailing

24

the terms agreed to, which are the same terms the court prohibited AVC from objecting to, and noting "[t]his is the final step in the settlement process." AVC did not respond to this email stating their objection to the settlement terms.

Thus, the substantial and credible evidence in the record supports the court's finding that AVC provided Starkey with authority to negotiate and agree to terms designed to move the development and site plan applications forward in an effort to gain final approval. We affirm the trial court's rejection of AVC's attempt to disavow the authority they gave to Starkey to negotiate settlement terms on their behalf.

The trial court's order delineated specific conditions negotiated by Starkey, which the court found AVC either agreed to or were not affected by those conditions. The court did not prohibit AVC from objecting to any new or additional terms; nor did the court modify the parties' Amended Agreement. Rather, the court, using its broad discretionary authority to fashion a remedy, determined that the Amended Agreement remained in full force, and enforced the settlement terms that the parties negotiated and agreed to.

We discern no abuse of discretion in the trial court's decision to prohibit AVC from further stalling the <u>Whispering Woods</u> hearing by limiting its ability to object to terms to which it already agreed. The purpose of this hearing is to

A-0834-23

determine whether the settlement terms will be binding on the Planning Board. If, as the court noted, the development application is not approved, the parties may pursue the matter further through the Law Division to address the issue of damages.

To the extent we may not have addressed an argument raised by defendants, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0834-23